Frohman v. Lowenstein.

## JOSIE FROHMAN v. MAMIE LOWENSTEIN et al., Appellants.

In Banc, March 22, 1924.

1. **ABSTRACT: Filed in Court in Banc.** A timely filed new abstract
of the record in a case coming from Division into Court in Banc is
proper. The fact that an opinion was rendered in Division dismiss-
ing the appeal for failure to comply with the rules relating to
abstracts does not prevent the filing in Court in Banc of a new
abstract conforming to the rules and supplying the defects pointed
out in the opinion, nor does it prevent Court in Banc from re-
jecting the divisional opinion and rendering one on the merits.

2. ————: **Printing Questions and Answers: Rules.** An abstract of
the record in which the evidence, by questions and answers, is
printed in full, instead of being stated in substance and narrative
form, is not defective, and an appeal cannot be dismissed on the
sole ground that the evidence is so printed. The word "shall" in
Rule 13, declaring that "the evidence of witnesses shall be in
narrative form, except when questions and answers are necessary
to a complete understanding of the testimony," is not mandatory,
as is shown by a comparison of Rule 13 with other rules, and par-
ticularly with Rule 14, and a consideration of all the rules to-
gether. Besides, it would be unfair to make a litigant's right to be
heard in an appellate court dependent upon the accuracy of the
judgment of his attorney in attempting to determine what part of
the testimony should be set forth in narrative form and what part
by questions and answers.

    *Held,* by DAVID E. BLAIR, J., that, since appellants, after the case
    reached Court in Banc, prepared and filed a new abstract in
    narrative form, as they had a right to do, there is no call

for a consideration of the sufficiency of the abstract filed in Division, but that question was eliminated from the case.

3. **WILL CONTEST: PLEADING: Motion to Strike Out.** It is unnecessary on defendants' appeal to consider an assignment that the trial court erred in refusing to strike out of the petition an allegation that the will was the result of fraud and duress practiced upon the testator by the chief beneficiary, where such charge was abandoned by the submission of the case upon the issues of incapacity and undue influence alone.

4. ———: **Jury Issue.** If there is any substantial evidence to support the charge that the testator was mentally incapacitated to make a will, or that the will was the result of undue influence over the weakened mind of testator, the issue of will or no will must be submitted to the jury.

5. ———: **Incapacity: Lay Opinions.** Courts scan with care the evidence upon mental incapacity, to see that lay witnesses detail facts from which they can express an opinion upon that subject.

6. ———: ———: **Physical Infirmity.** Where there is no substantial evidence that testator was mentally incapacitated at the time he made his will seven years prior to his death, and the testimony only tends to show that his lips were drawn down, saliva ran from his mouth, he required assistance in putting on his clothes and arose and walked with difficulty, all the result of bulbar paralysis, from which he began to suffer two years before the will was made and continued to suffer for nine years and which his family physician, contestant's witness, testifies is a disease that does not affect the mind, and the physician further testifies that testator's mind was sound, and there is no evidence to the contrary, a demurrer to the evidence on the issue of mental incapacity should be sustained.

7. ———: **Undue Influence: Inequitable Disposition.** If the testator was of sound mind, and his will was not the product of undue influence, the will cannot be set aside, although it made an inequitable disposition of his property.

8. ———: ———: ———: **Wife as Sole Legatee.** The fact that the testator gave his entire estate amounting to $30,000 to his wife, who had three children to support and educate and herself to maintain, in view of the fact that he had previously advanced over $8000 to contestant, a daughter by a former wife, mentioning in his will his reason for giving her only $100 his previous advancements to her, does not have an ugly look, and does not of itself indicate undue influence.

9. ———: ———: **Letters and Statements.** Letters written by testator to his married daughter indicating that his home life was

unpleasant, while competent to prove mental condition and the state of his affections, are not evidence of the facts of his home life, and neither are oral statements by him.

10. ———: ———: **Transfer of Property.** The transfer, after the will was made, of property to testator's wife, to whom the will gave his entire estate, was in accordance with the will, and no evidence of undue influence.

11. ———: ———: **Fiduciary Relation: Burden.** The relation of husband and wife, to whom his will gave all his property, does not alone establish such a fiduciary relation as places upon her the burden of proving the will was not the product of her undue influence over him.

12. ———: ———: **Failure to Testify.** The burden is upon contestants to show undue influence, and if they fail, there is no necessity for testator's wife, the chief beneficiary of his will, to testify, and no unfavorable inference against her can be drawn from her failure to testify.

Headnote 1: **Appeal and Error,** 4 C. J. sec. 2098; **Courts,** 15 C. J. sec. 515 (1926 Anno). Headnotes 2 and 3: **Appeal and Error:** 2, 4 C. J. sec. 2075; 3, 4 C. J. sec. 2914. Headnotes 4 to 12: **Wills:** 4, 40 Cyc. 1321; 5, 40 Cyc. 1041; 6, 40 Cyc. 1321; 7, 40 Cyc. 1079; 8 Cyc. 1167; 9, 40 Cyc. 1157, 1158; 10, 40 Cyc. 1170 (1926 Anno); 11, 40 Cyc. 1153; 12, 40 Cyc. 1150 (1926 Anno).

Appeal from Linn Circuit Court.—*Hon. J. E. Montgomery,* Judge.

REVERSED (*with directions*).

*Schmitz & Marshall* for appellants.

(1) A mentally competent testator may dispose of his property as he sees fit. After formal proof of execution of will and of testator's sanity, contestant has the burden of producing substantial evidence to support the allegation of testamentary incapacity. Sanford v. Hollan, 276 Mo. 457; Hayes v. Hayes, 242 Mo. 155; Southworth v. Southworth, 173 Mo. 73; Fulbright v. Perry Co., 145 Mo. 432; McFaden v. Catron, 138 Mo. 197; Riley v. Sherwood, 144 Mo. 354; Von de Veld v. Judy, 143 Mo. 348; Berberet v. Berberet, 131 Mo. 411; Cash v. Lust, 142 Mo. 631; Defoe v. Defoe, 144 Mo. 458; Riggin v. Westminster College, 160 Mo. 571; Wood v. Carpenter, 166 Mo. 487;

Hahn v. Hammerstein, 272 Mo. 248; Hatton v. Cochran, 208 Mo. 410; Roberts v. Bartlett, 190 Mo. 696; Winn v. Grier, 217 Mo. 420; Sayre v. Trustees of Princeton University, 192 Mo. 95; Brinkman v. Rueggesick, 71 Mo. 553; Sehr v. Lindeman, 153 Mo. 276; Gibony v. Foster, 230 Mo. 131; Bensberg v. Washington University, 251 Mo. 641; Andrew v. Linebaugh, 260 Mo. 623; Archambaralt v. Blanchard, 198 Mo. 384. Failure of memory from old age or sickness, forgetfulness of names, idle questionings requiring repetitions of information and personal eccentricities, are not evidence of mental deterioration rendering testator incapable of disposing of property. Hahn v. Hammerstein, 272 Mo. 248. Testamentary disability must be shown to have existed at the very time of executing the will; testator's condition at other times being admissible only so far as tending to show his condition at that time. Spencer v. Spencer, 221 S. W. 58. The fact that a testator may be very old and very ill does not show testamentary incapacity. Lindsey v. Stephens, 229 Mo. 600. The conclusion is irresistible from the testimony in this case that Abraham Lowenstein was sane within the meaning of the law at the time of the execution of this will. Hahn v. Hammerstein, 272 Mo. 262; Gibony v. Foster, 230 Mo. 133; McFaden v. Catron, 138 Mo. 197; Sehr v. Lindeman, 153 Mo. 276; Winn v. Grier, 217 Mo. 420. (2) By undue influence is meant the substitution of the will of another person for that of the testator so that the testator is not able to dispose of his estate as if left to his own guidance or free agency. Hayes v. Hayes, 242 Mo. 155; Huffnagel v. Pauley, 219 S. W. 373. The burden of proof is upon the contestant who alleges undue influence to prove it. Sanford v. Holland, 276 Mo. 457; Crowson v. Crowson, 172 Mo. 702; Campbell v. Carlisle, 162 Mo. 634; Gordon v. Burris, 141 Mo. 613; Doherty v. Gilmore, 136 Mo. 414; Morton v. Heidorn, 135 Mo. 608; Carl v. Gabel, 120 Mo. 283; Jones v. Roberts, 37 Mo. App. 174. A wife who participates in transactions and advises her husband with reference to his business does not become charged with a trust with reference to his property and does not

have the burden of showing that she did not exercise un-
due influence on him.   Hern v. Dysart, 220 S. W. 908;
Andrew v. Linebaugh, 260 Mo. 623.   The fact that the tes-
tator's wife is the chief beneficiary raises no presumption
of undue influence.   Fulton v. Freeland, 219 Mo. 494.   In-
fluence must not only exist but must have its influence up-
on the will.   Crowson v. Crowson, 172 Mo. 703; Sunder-
land v. Hood, 13 Mo. App. 232; Sunderland v. Hood, 84
Mo. 293; Brinkman v. Rueggesick, 71 Mo. 553.   (3)   A
will contest is a suit at law and the court will not weigh
the evidence when it is conflicting, but it is within the
province, right and duty of the court to examine the re-
cord to see if there is any substantial testimony to autho-
rize the submission of the case to the jury, and where
there is no substantial testimony upon which to submit
the case to the jury, the court has the same right to direct
a verdict as in any other action and will so do.   Winn v.
Grier, 217 Mo. 447; Beyer v. Schlenker, 150 Mo. App. 671;
Teckenbrock v. McLaughlin, 200 Mo. 533; Young v.
Ridenbaugh, 67 Mo. 574; Appleby v. Brock 76 Mo. 314;
Hamon v. Hamon, 180 Mo. 685; Gibony v. Foster, 230 Mo.
106.   (4)   Statements made by a testator before and after
the execution of the will are competent evidence as exter-
nal manifestations of his mental condition, and of the
state of his natural affections, but not as evidence of the
truth of the facts stated.   Crowson v. Crowson, 172 Mo.
703; Rule v. Maupin, 84 Mo. 587; Thompson v. Ish, 99 Mo.
170; Gordon v. Burris, 141 Mo.  613; Hayes v. Hayes, 242
Mo. 155; Teckenbrock v. McLaughlin, 209 Mo. 550.   (5)
An attempt to commit suicide is admissible in evidence,
but does not establish unsoundness of mind.   Holton v.
Cochran, 208 Mo. 314; 1 Alexander on Wills, p. 478.

*L. A. Chapman* and *Frank Sheetz* for respondent.

(1)   In order to be able to make a will the testator
must, at the time of the execution of the same, be cap-
able of comprehending all his property and all the per-
sons who reasonably came within the range of his bounty,

and be possessed of sufficient intelligence to understand his ordinary affairs and to know and understand what disposition he was making of his property. There was substantial evidence in this case to show that the said Abraham Lowenstein was incapacitated to make a will. The court committed no error in submitting the matter to the jury. They had the right to determine this issue of his mental capacity from all the facts and circumstances detailed in the evidence. 1 Alexander's Commentaries on Law of Wills, sec. 329, p. 439, note 14; Leubert v. Brockmeyer, 158 Mo. App. 196; Berst v. Moxom, 157 Mo. App. 343; Ray v. Walker, 240 S. W. 193. The unnatural disposition of testator's property, practically disinheriting respondent, tended to discredit the testamentary capacity of testator. Gott v. Dennis, 246 S. W. 218. See, also, Crum v. Crum, 231 Mo. 638; Riggin v. Westminster College, 160 Mo. 579; Holton v. Cochran, 208 Mo. 314; Goodfellow v. Shannon, 197 Mo. 271; Meier v. Buchter, 197 Mo. 68; Knapp v. Trust Company, 199 Mo. 665; Harvey v. Sullens, 56 Mo. 372; Turner v. Anderson, 236 Mo. 523. (2) Undue influence is one of the grounds of this contest. Undue influence is such influence as amounts to over persuasion, coercion, fraud and force, substituting the will of another for the will of the testator, but it is not necessary that the existence and exercise of undue influence be shown by direct and positive evidence, but it is sufficient if the same may be inferred from the facts and circumstances in evidence. In this case there was strong and overwhelming evidence showing the instrument of writing was not the will of Abraham Lowenstein, because it was the product of the undue influence of his wife. Naylor v. McRuer, 248 Mo. 423; Turner v. Anderson, 236 Mo. 541; Balak v. Susanka, 182 Mo. App. 498; Meier v. Buchter, 197 Mo. 68. Testator always manifested great affection for respondent, with other circumstances shown in evidence, and then disinherited her, and for such facts must be submitted to the jury on the question of undue influence.

Gott v. Dennis, 246 S. W. 218. (3) The burden of proof is on the proponents of the contested will to show by the preponderance of the evidence that the testator at the time of the execution of said will was of sound mind. Naylor v. McRuer, 248 Mo. 425; Mowry v. Norman, 204 Mo. 189; Balak v. Susanka, 182 Mo. App. 469; Bensburg v. University, 251 Mo. 656; Bradford v. Blossom, 207 Mo. 177-228; Turner v. Butler, 253 Mo. 202. And rests with the proponents throughout the case. Rayl v. Golfino-pulos, 233 S. W. 1071. (4) This will by its very terms and provisions is evidence of undue influence. It gives practically all of the estate to the wife, disinheriting the respondent, the only child of testator by his former marriage. The unequal distribution of property made by a will is some evidence of undue influence. It is at least a very strong link in the chain and the jury had the right to consider it with other evidence. Byrne v. Byrne, 157 S. W. 609. And is evidence tending to show lack of testamentary capacity. Dunkerson v. Williams, 242 S. W. 658. A harsh and unnatural disposition by the will is a circumstance which tends to discredit the maker's testamentary capacity. Meier v. Buchter, 197 Mo. 89; Schuler on Wills (3 Ed.) sec. 77; 1 Underhill on Wills, sec. 105; Page on Wills, sec. 385. (5) On demurrer to the evidence contestants are entitled not only to the full force of all their uncontradicted evidence, but to have their evidence taken as true where contradicted, and every reasonable inference to be deducted from the evidence is to be allowed in their favor in determining the law question made on demurrer. Teckenbrock v. McLaughlin, 209 Mo. 540; Whittelsay v. Girding, 246 S. W. 311; Burton v. Holmes, 231 S. W. 633. (6) Where the will bespeaks an unnatural disposition of testator's property the burden rests upon the principal beneficiary to show that it was not the result of undue influence. Wendling v. Bowden, 252 Mo. 648. There being evidence of undue influence besides the gross inequality and unnatural discrimination of the testator against his daughter in his will, such unnatural discrimination it-

self becomes evidence of such undue influence, and the burden of proof on the issue of undue influence was thereby shifted from the contestants to the proponents, the same as where a confidential relation is shown. Gott v. Dennis, 246 S. W. 224; Roberts v. Bartlett, 190 Mo. 680; Gay v. Gillian, 92 Mo. 264; Meier v. Buchter, 197 Mo. 88; Ray v. Walker, 240 S. W. 195; McFadin v. Catron, 120 Mo. 252. Testator was weak both mentally and physically and was a fit subject for influence from stronger minds. Byrne v. Byrne, 250 Mo. 646. (7) Mrs. Lowenstein, really the sole beneficiary under the pretended will in contest, did not dare to become a witness on the trial of this case. No explanation was offered of such failure, and this fact authorizes an inference that her evidence would not sustain the proponents' contention, but would be detrimental to it. Dunkerson v. Williams, 242 S. W. 658. Mrs. Lowenstein was charged with fraud, coercion and undue influence. These facts were peculiarly within her own knowledge and her failure to appeal and testify in denial of the charge carries with it the usual unfavorable and damaging presumptions. Connecticut Life Ins. Co. v. Smith, 117 Mo. 294. And raises a presumption that her defense is not made in good faith. Bryant v. Lazarus, 235 Mo. 612; Kame v. Railroad, 254 Mo. 658; 1 Moore on Facts, page 555, *post* and *ante*. Respondent's evidence suggests the propriety of an explanation by the other party, who could tell the whole story. Such a suggestion in this case swells into a demand. Then silence becomes pregnant with inferences. Leeper v. Bates, 85 Mo. 228; Cass County v. Green, 66 Mo. 512; Goldsby v. Johnson, 82 Mo. 605; Baldwin v. Whitcomb, 71 Mo. 658.

GRAVES, J.—This is an action to contest the will of Abraham Lowenstein, deceased. The will was made in 1912, and testator died in 1919. The plaintiff is the daughter of deceased by his first wife (who died when plaintiff was young), and the defendants are the second

wife (Mamie Lowenstein, the chief beneficiary) and her three children.

The petition charges (1) fraudulent conduct upon the part of Mamie Lowenstein, in an attempt to estrange Abraham Lowenstein from the plaintiff; (2) mental incapacity of testator, and (3) undue influence of Mamie Lowenstein over the weakened mind of the testator. The cause reached this court from Division Two where an opinion was rendered dismissing the appeal for failure to comply with our rules as to abstracts of records. The only alleged defect of the abstract of the record was that the evidence, by questions and answers, was printed in full, rather than stated in substance and narrative form. This opinion was discarded by Court in Banc, and the case assigned for opinion In Banc, as if no opinion had ever been written in the cause. However, there was a motion in Court in Banc to strike out another abstract of record filed by appellants in Court in Banc and this motion was taken with the case, and is here now for disposition. This second record prints the evidence in narrative form. This, of course, lies at the doorway, and must be disposed of before entering upon the merits.

On the merits, it will suffice to say, for this general outline of the case, that the answer placed in issue the divers charges in the petition, and the reply (in nature of a general denial) placed in issue any new matter, if such there was, in the answer. Upon a trial before a jury in Linn County, where the cause went upon change of venue, said jury returned a verdict in this language:

"We, the jury find that the paper writing offered in evidence is not the last will and testament of Abraham Lowenstein, deceased.

"JOHN W. LOCKHART, Foreman."

From a judgment upon such verdict the defendants have appealed to this court. Further details are left to the opinion.

I. The motion to strike out the abstract of record filed in this court, after the transfer from Division Two,

is of some length, but raises but two questions; (1) that no new abstract of record can be filed after the transfer of a case from Division to Banc, and (2) that the only matter for consideration here is the sufficiency of the abstract filed in Division Two, and the sufficiency of such abstract had been adjudged by Division Two.

*Abstract in Banc.*

To give in their own language the idea of counsel, we quote: "The only issue to be determined was the one question of appellate practice, and it appears from the opinion In Banc that the Court in Banc either adopts the opinion rendered in a Division or rejects it, but does not render an opinion more extensive than the opinion in Division." This doctrine, learned counsel say, is announced in Bank v. Kropp, 266 Mo. l. c. 227.

So much confusion in the practice has arisen since the publication of the original opinion in this case, that we shall discuss all features of the situation.

The opinion in Bank v. Kropp, supra, lends no aid to the contention made by learned counsel for respondent. That case does not rule, as they contend, that an opinion in Court in Banc cannot be "more extensive" than the opinion of the Division from which the case comes. Learned counsel rely upon a *per curiam* In Banc, by which the divisional opinion was adopted In Banc. Such *per curiam* reads:

"This cause coming into Banc from Division Two, because of the pending there of the same question here involved, was re-heard In Banc and the foregoing divisional opinion of FARIS, J., was adopted."

It is true that the opinion relates to a matter of practice, but the *per curiam* adopting the opinion as the opinion In Banc, is no authority for holding that the Court in Banc might not have rejected the opinion and written a new one along wholly different lines. In fact the concurring opinion shows that there had been adverse views upon the same subject. Many times has Court in Banc written opinions wholly at variance with the divisional opinion, and in which the case is finally determined upon wholly different questions.

That a timely filed new abstract of record in a case coming from Division to Banc, is proper, has been so recently ruled, that we shall not re-discuss that question, but leave it to our last ruling thereon, and the cases forming the basis for such ruling. [Morris v. Kansas City Light & Power Co., 302 Mo. 475.]

In a sense we have three separate courts for the hearing of cases. We have Divisions One and Two, and the Court in Banc. But all this is suggested in the Morris Case, supra.

II.   So much uproar was occasioned by the dismissal of the appeal in this case in Division Two, that notice to the sufficiency of the abstract there held violative of our rule should be taken, for the information of the bar, and especially those members thereof who may now have on file similar abstracts of record in their cases. The sole objection to the abstract of record was that it set out in full the evidence by questions and answers. In our service of eighteen years upon this bench there have been quite a number of motions to dismiss appeals for the reason that the evidence was not reduced to narrative form as far as practicable. The records in the clerk's office will so show, but the records will further show that this court always overruled such motions. The advent of new judges seems to have encouraged the repetition of such motions. It was after several of such motions that we said in Vaughn v. Vaughn, 251 Mo. l. c. 445:

"(a)   The appellants in their abstract seem to have printed the bill of exceptions in full, giving questions and answers, where oral evidence was taken. The first ground of the motion strikes at this method of abstracting the evidence. The point is not well taken. We have always held that the printing of all the evidence in form of questions and answers, was not a violation of the rules. This point is therefore overruled."

The contention of counsel is based upon that portion of Rule 13 of this court which reads:

"The evidence of witnesses *shall* be in narrative form, except when the questions and answers are necessary to a complete understanding of the testimony. Pleadings and documentary evidence shall be set forth in full when there is any question as to the former or as to the admissibility or legal effect of the latter; in all other respects the abstract must set forth a copy of so much of the record as is necessary to be consulted in the disposition of the assigned errors."

They contend that the use of the word "shall" makes the rule mandatory. As said we have never so construed the rules. On the contrary we have continuously overruled motions to dismiss appeals when bottomed upon that view of the rule. We venture the assertion that, since our advent upon this bench, at least seventy-five per cent of the cases determined would have been determined by dismissing the appeal under counsel's view of the rule.

But the very fact that the rule leaves it to counsel to determine when they should give the evidence in narrative form, and when by question and answer, demonstrates that the word "shall" was not used in a mandatory sense. It was never intended by the rules of this court to place an iron jacket around counsel in the exercise of his judgment as to whether or not the evidence should appear by question and answer. According to contention of learned counsel this court would be compelled to go over every abstract (if such be challenged by a motion to dismiss the appeal) and see if the appellant's lawyer had put in narrative just a certain portion of the evidence, and put in by question and answer that portion wherein the questions and answers were necessary to the full understanding of the evidence. Counsel's contention of the rule would place lawyers in a very precarious situation. If they did not put in narrative form all of the evidence which should be placed in narrative form their appeal would be dismissed. On the other hand if they put in narrative form some portions of the evidence which should be by questions and answers, out would go their appeal. Every lawyer would abstract his

case at his peril. If his judgment failed him, out would go his appeal. Not only so, but this court would be try-ing "abstracts" under our rules, rather than the cases of litigants. Up to this case the court had never so viewed our rules. We must read all of our rules, and not merely a small portion of one rule. We have four rules per-taining to abstracts of record, viz., Rules 11, 12, 13 and 14. Rule 11, as found in Mo. Reports, vol. 294, speaks of abstracts of record when the appeal has been perfected by a short transcript under Section 1479, Revised Stat-utes 1919. The last paragraph of the rule is not appli-cable to the question here involved. Rule 12 relates to abstracts of record in cases where a complete transcript of the record has been filed, rather than the short form mentioned in Rule 11. Rule 13 pertains to the contents of abstracts of record, whether it be the one mentioned in Rule 11 or the one mentioned in Rule 12. The latter paragraph of this rule has no bearing upon this case. Both Rules 11 and 13 were amended in 1920, and the last paragraph in each is the result of the amendments. It suffices to say that these three rules deal with abstracts of record, but they are not all the rules so dealing. We have Rule 14, which reads:

"A printed and indexed transcript duly certified by the clerk of the trial court may be filed instead of a man-uscript record, *and in all cases printed, indexed and un-certified copies of the entire record, filed and served within the time prescribed by the rules for serving ab-stracts, shall be deemed a full compliance with said rules and dispense with the necessity of any further abstracts.*"

We have italicized the vital portion. Up to the com-ma following the words "manuscript record" the rule authorizes a certified "printed and indexed transcript" instead of a manuscript transcript. Under the old prac-tice the Clerk of the Circuit Court made out and certi-fied a full transcript of the record, which included the bill of exceptions and evidence. When we began the practice of law this was the only method of perfecting an appeal. This transcript was filed with the Clerk of

the Supreme Court, and the docket fee paid and the appeal was perfected. Later the short transcript was authorized by law. Rule 14 permitted the lawyers to have printed and indexed a full transcript of the record, and this, when certified to by the clerk of the trial court, could be filed in lieu of the old manuscript transcript. But the rule does not stop there. It proceeds: "and in *all* cases printed, indexed and uncertified copies of the entire record, filed and served within the time prescribed by the *rules* for serving abstracts, shall be deemed a full compliance with said *rules* and dispense with the necessity of any further abstracts." Note the word "rules." The plural is used. The reference is to Rules 11, 12 and 13. They are the "rules" covering the question of printing and serving abstracts. Rule 14 in plain terms says that the appellant can print the whole transcript or record of a case, and serve and file it within time, and such shall be deemed a compliance with our *rules* as to abstracts. It says *"all cases"*—not merely cases brought here by full transcript rather than short transcript. It refers to *"rules"* and not to Rule 12 in particular. In other words this Rule 14 places all litigants upon the same basis. If the litigant appeals by short transcript he may print the full transcript or record of his case, and it shall be deemed a full compliance with the "rules" as to abstracts. The litigant filing the full transcript can do the same thing and satisfy the rules. So we have said in our own Rule 14, and being the later rule it would govern. But this Rule 14 is but expressive of the meaning of the previous rules. It demonstrates that Rule 13 was never intended to be mandatory. The abstract first filed was within our rules.

III. Going now to the merits of the case, we find that there was a motion to strike out certain portions of the petition, and it is insisted here that there was error in refusing to sustain such motion. In the view that we have of the case, we need not pass upon this matter. We can take the petition and its allegations in the fullest, and

yet we are forced to a single conclusion. It is true that the petition in addition to the usual grounds of mental incapacity and undue influence further charges fraud and duress in procuring the will. However, when counsel for plaintiff come to submitting their case to the jury they rely only upon mental incapacity and undue influence. Fraud and duress are abandoned. We need consider only the question submitted, in this situation of the case. Learned counsel for appellants insist that there is no substantial evidence upon which to submit mental incapacity, or undue influence upon the part of Mrs. Lowenstein. We have read carefully the voluminous record in this case and have concluded that the contention of appellants will have to be sustained. Proper peremptory instructions were offered in the trial of the case at all proper times, and the refusal of these by the trial court was error in our judgment. The details upon each question we take up in the following paragraphs. We have always urged that the trial of will cases stood upon the same plane as the trial of other cases. That is, if there was substantial testimony upon the issue to be submitted, the jury should determine the facts. [Goodfellow v. Shannon, 197 Mo. l. c. 277.; Major v. Kidd, 261 Mo. l. c. 617.]

As stated in the Major Case, supra, courts scan with care the evidence upon mental incapacity, to see that the witnesses detail facts from which they can express an opinion upon mental incapacity. This as to the lay witnesses.

If there is no substantial evidence upon which to submit the question of mental incapacity it is error to submit such question, as it would be in any other kind of a law suit.

IV. Before reading the evidence in this case, we wondered why distinguished counsel for respondent so earnestly pressed their motion to dismiss the appeal. We understood when we read the record, and we read the full record, not the narrative form record filed in Banc. The trial court permitted the jury to make a will

for Lowenstein.   Upon what ground the jury proceeded
we do not know, but we shall take the question of men-
tal incapacity first.   The case took the usual course.   By
the prima-facie case it is shown that the testator was
of sound mind at the execution of the will.   The plain-
tiff then placed upon the stand Dr. Grace, who was the
family physician for Mr. Lowenstein, and treated him
from 1910 up to the time of his death.   He says that the
testator came to him in 1910, or early part of 1911, and
he found him suffering from bulbar paralysis, which he
said was incurable, and usually ran its course in from
two to four years, but that in this case it ran along for
nine years.   He says: "A person can be helped consid-
erably, but not cured."   He also says: "The disease
does not affect the mind."   Pressed by counsel for de-
fendants the physician said:

"Q.   Doctor, during all the time that you have tes-
tified about, from 1910, '11, '12 and '13, just state to this
jury from your observation of Mr. Lowenstein any con-
versation with him and your treatment of him as a phy-
sician as you described to the jury, state to the jury
whether he was of sound or unsound mind?   A.   Sound
mind.

"Q.   Doctor, state to the jury whether or not this
bulbar paralysis, if it isn't a fact that it is a disease that
doesn't affect the mind.   A.   Not necessarily; a man looks
as if he is silly, looks very peculiar, but it is on account
of the paralysis that draws his lips down; his mouth is
usually drawn.

"Q.   Mr. Lowenstein's mind was sound, wasn't it
Doctor; wouldn't you say Mr. Lowenstein's mind was
sound up within thirty days of his death, or probably six
months of his death?   A.   Well, yes, I would think it
was; he was worried, but he wasn't insane.

"Q.   And never was at any time?   A.   Never was
insane."

In 1907, Mr. Lowenstein, during the great panic of
that year, had lost heavily—$75,000 according to his
statement.   He took a dose of laudanum, with suicidal

intent, the latter part of that year, and assigned his financial reverses as the reason therefor, but having been found in time his life was saved, and he continued in active business life from 1907 to 1913, when he disposed of his business. His business was no small affair. He did as much as $100,000 or more in a single year. Such sums in 1912 and 1913. During the time he was executor of a large estate. He dealt with banks and large business firms.

In August, 1912, he visited his daughter, Mrs. Josie Frohman in Danbury, Connecticut, and returned the latter part of the month. He had made a previous will in 1901, in which he gave this daughter one-third of his property and some life insurance which he carried in her name. It is claimed, but disputed, that when he returned to his home town, Chillicothe, he did not go home, but went to Fannie Lowenstein's residence near his home. Mrs. Shirley so testified. She further testified:

"Q. Did you have any talk with Mr. Lowenstein himself? A. No, I never talked to Ab.

"Q. Did you speak to him? A. Yes, sir.

"Q. Now, did you observe him there at that time? A. Oh, yes.

"Q. What was his physical condition? A. He seemed to be very feeble, set with his hands like he always did, he would fall asleep if anybody would be taking to him and slobber run out of his mouth before company."

Mrs. Fannie Lowenstein was an aunt. The deposition of one Moses Alexander was offered. In that the witness said he visited testator in 1916. This was four years after the will was executed. His disease was a progressive one, and this witness says:

"Q. From your acquaintanceship with Abraham Lowenstein, from your observations of him, and from conversations with him at the time you last saw him, state whether he was, in your opinion, of sound or unsound mind? A. Unable to accurately answer. My impression,

at the time I last saw him and talked with him, was that he was quite weak physically and mentally.''

So, too, Homer Reynolds says that at one time in 1916 he saw Mr. Lowenstein on the street, and that he was lost and asked the way home. He was some two blocks from home and was bare-headed and in his shirt sleeves.

As said in 1912 he visited his daughter and she was a witness. The father was with her from August 2nd to the 20th of the month. She accompanied him to Buffalo, N. Y., and got an acquaintance, who was going to Chicago, to help him on the trip from Buffalo to Chicago. This she said she did on account of his enfeebled condition. Being pressed she testified in exact terms as follows:

"Q. Just state what his condition was, you can't state why you accompanied him, state what his condition was physically? A. It was very bad for papa to undress and dress himself. I had been taking care of him, I really couldn't see how he was going to get home very well, at least I felt so; from Buffalo to Chicago he was accompanied by a business acquaintance; I met this gentleman at the station and I asked him if he would be kind enough—

"Q. Well, you put him in charge of this man? A. Yes, sir, I asked this gentleman if he would try to look after him, papa wasn't able—

"By the Court: Don't state the conversation.

"A. I will have to say I placed him in charge, I suppose.

"Q. You put him in charge of this man? A. Yes, sir.

"Q. And arranged for his being taken care of? A. Yes, sir.

"Q. Now, Mrs. Frohman, you might state what was his physical condition while he was there with you; just state to the jury what his physical condition was? A. It was bad for him to navigate, bad for him to get up, you would really have to start him; he lost the saliva from his mouth, he dozed and didn't seem to be able to concentrate his mind for some length of time on any subject—

Frohman v. Lowenstein.

"By Mr. Marshall: We object to the last statement.

"By the Court: Overruled. To which ruling of the court the defendants then and there excepted at the time and still except.

"Q. You say that he had to be started? A. Yes, sir.

"Q. He had to be helped up? A. Yes, sir, when he wanted to arise in his chair; I had to put on his shoes and lace them for him, put on his collar and tie his tie, cut his meat at the table, and in general waited on him pretty much as you would a child.

"Q. Did you notice when he was walking, how he walked? A. Well, he—

"Q. Can you describe his walk, how he held himself, what was his appearance? A. He had sort of a shuffling gait, his hands was in that position, what was apparently a symptom of the disease he was suffering from.

"Q. You conversed with him then? A. Yes, sir.

"Q. Just tell the court about his conversation? A. Well, it was a great source of pleasure to my father and myself to be able to have an unrestricted visit.

"By Mr. Marshall: I object to that.

"By the Court: Sustained. To which ruling of the court the plaintiff then and there excepted at the time and still excepts.

"Q. State as to whether or not he could carry on a connected conversation, or not?

"By Mr. Marshall: I object to that.

"By the Court: Overruled. To which ruling of the court the defendants then and there excepted at the time and still except.

"Q. Did he carry on a connected conversation? A. He met friends of mine, he did not seem to remember them.

"By Mr. Marshall: I object to that, it is not responsive to the question.

"By the Court: Overruled. To which ruling of the court the defendants then and there excepted at the time and still except.

"Q. Go ahead. A. He didn't seem to be able to settle down very much, he did talk of his business affairs and what his desires were in regard to some of his holdings and property, and so on, I don't know if I can relate exactly the conversations, I can relate one conversation, I don't know why my father spoke of wanting to make a will, and said that he had been wanting to do it, that he had made a will many years ago, but his wife was not aware of the fact, he said he wished me to have what he had willed to me, because—

"By Mr. Marshall: I object to the statement of the contents of the written instrument—

"By the Court: Overruled. To which ruling of the court the defendants then and there excepted at the time and still except.

"Q. Go ahead? A. He said he wanted me to have one-third of his estate, and the will he showed me in 1910 was still standing in 1912; he said he really wished me to have it because the foundation of his wealth was acquired through my mother.

"By Mr. Marshall: I object to that.

"By the Court: Overruled. To which ruling of the court the defendants then and there excepted at the time and still except.

"A. (witness continuing) That was one of the conversations I had with my father.

"Q. Go ahead, what did he say was the relation why he wanted to give you one-third? A. He said he wished to give me one-third because the foundation of his money had come from my mother; at the time he married her, he had very little.

"Q. I believe you stated that you waited on him all the time he was there? A. Yes, sir.

"Q. Will you tell the jury what was the condition of his bed and pillow? A. His pillow was always wet from saliva from his mouth, and at my request my father consulted a physician, who told me."

The witness was prevented from telling what the physician told her. In 1913 this plaintiff came to Chilli-

cothe, Missouri, and met her father there. She was there two or three weeks and saw her father each day. The father was running his business at the time. The business, as should have been stated sooner, was a produce and commission business. This witness gave no testimony on mental condition in 1913. Chris Boehner, one of the defendant's witnesses, says:

"Q. I will ask you to state—based upon your business dealings with Mr. Lowenstein and your conversations with him, and observation of him as you have detailed them to the jury, and based upon the matters you have detailed to the jury—state whether he was of sound or unsound mind? A. Well, at times seemed like he talked rather like he was of sound mind, and yet there was sometimes a little doubt in my mind as to whether he might be or might not be, I couldn't say he wasn't.

"Q. Along in 1911, '12 and '13, his business judgment—A. Well, along about that time, of course, I couldn't recall, because I didn't come in contact with him; as I stated before that was about the time I gave up my business, I think it was right along about that time, and I noticed he was failing somewhat, but, that is, he complained a whole lot.

"Q. But until the time he went out of business, and the first time you visited in his home after that, Mr. Boehner, would you then state that he was of sound or unsound mind at that time? A. I didn't hardly discover anything in his talk at the house; of course, we did not talk much about any regular routine of business, we just simply talked about other things mostly, and I didn't have a very good chance to sound a man along that line, just from what little conversation we had.

"Q. I mean up until the time he went out of business and the first you saw of him after he went out of business at that time, Judge, what would you say then as to his mind? A. Well, to my best knowledge and belief his mind was reasonably clear; there wasn't very much said, in fact, I didn't stay with him very long, perhaps, thirty or forty minutes, probably an hour."

Present counsel for plaintiff represented deceased in 1914 as his lawyer in a lawsuit and had a written contract of employment. In 1913 the same counsel on the other side of a big will contest case made a settlement with Abraham Lowenstein for $25,000. His sanity was not questioned seemingly.

The foregoing is the case on mental capacity, so far as plaintiff is concerned. A mass of evidence for the defendant showed a sound mind and good business capacity, even after he quit business in 1913. This evidence came from his near neighbors and constant associates. On this record the question of mental incapacity should not have gone to the jury. The demurrer to the evidence to this effect should have been sustained.

V.  There is less evidence upon which to bottom the charge of undue influence. It does appear that plaintiff and her mother had not been on friendly terms since the latter part of the year 1905, but up to that time they had lived in the same house. Who was at fault does not appear clearly from this record. It does appear that Lowenstein's estate was worth about $30,000; that in addition to plaintiff he had a wife and three children; that including the wedding expenses of some $1100, he had given the daughter and her husband something near $8000. By the will plaintiff and the other three children were given $100 each. As to plaintiff it is mentioned in the will that the $100 is "in addition to advances heretofore made." All the remainder of the estate was given to the wife absolutely. The will was made shortly after the return of deceased from the visit to plaintiff in 1912, although he had talked to his lawyer about writing this will before he made the visit in 1912. The will bears date September 7, 1912, and deceased returned from his visit the latter part of August. The will was prepared and signed in his lawyer's office, and Mrs. Lowenstein was not present. This is peculiarly a case of facts rather than one of law. The applicable law could not be disputed. It is fixed by many previous rulings. If this will was the

product of undue influence upon the part of Mrs. Lowen-
stein, as undue influence is defined in the law, then the
writing is not the will of deceased. It is a useless task
to review our cases. There is no evidence in this record
of the wife making any effort to get her husband to make
a will. She and her step-daughter were unfriendly, but
that does not prove undue influence. Nor does the fact
that she got all the property, when she had three children
to support and educate, and herself to maintain, in view
of the amount of the estate, and the advancements to
plaintiff, look bad. But if the will was not the product of
undue influence, and the testator was sound in mind, this
case is ended, notwithstanding the alleged inequitable dis-
position of the property. It is true that there were some
letters from the father to the daughter (the plaintiff)
indicating that the home life of deceased was not pleasant.
In one instance, further, that it was unbearable. This
letter was after the making of the will. These letters,
whilst competent to prove mental condition and the state
of the affections of the testator, are no evidence of the
facts of the home life of deceased. So too as to oral state-
ments of deceased. There is no competent evidence in the
case showing any unpleasant home life, or the domination
of the testator by the wife. It does appear that, after the
will, he transferred some property to her, and changed
some insurance policies, but this accorded with the views
expressed in the will. He told his lawyer when the will
was written that his idea was to protect the three younger
children, and that in view of what he had advanced to
plaintiff these other children should have what was left.
The record is silent as to any attempt upon the part of
the wife to procure the making of this will or any other
will.

Learned counsel make much over the fact that Mrs.
Lowenstein, although present, did not testify. In the
first place, the burden was upon plaintiff to show undue
influence, and if she failed, as we rule, then there was no
necessity of Mrs. Lowenstein taking the witness stand
upon that question. We are cited to that line of cases

where fraud is charged, and the defendant, charged with the fraud, failed to testify. Those cases are not in point here. It is true that plaintiff did attempt to charge fraud and duress, but abandoned both in the evidence and in the instructions. The evidence in plaintiff's behalf failed to show either fraud or duress, and she abandoned that issue in her instructions. The burden was upon plaintiff to establish fraud and duress, and if she failed, as she did, no convicting inference can be drawn against Mrs. Lowenstein for failing to testify upon those matters. Being unproved, they needed no denial. No fiduciary relation is shown. The relation of man and wife is all that appears.

The trial court has erroneously permitted the jury to make a will for the testator in this case. The instructions in the nature of demurrers to the evidence should have been given.

The judgment is therefore reversed and cause remanded with directions to the trial court to enter up a judgment sustaining the will. All concur, *David E. Blair, J.,* in separate opinion.

DAVID E. BLAIR, J. (concurring).—I concur in the result reached on the merits. In my opinion, the present status of the record does not call for any consideration of the sufficiency of the abstract of the record filed in Division Two. When the case came to Court in Banc, appellant filed a new abstract of the record wherein the testimony was printed in narrative form. This effectually took out of the case the question covered by the opinion of HIGBEE, C., in Division Two, and rendered it entirely unnecessary at this time to determine any other questions outside of the merits, except the right of appellant to prepare and file a new abstract of the record in this court. This point has been decided in favor of appellant, and I agree that it has been correctly decided. [Morris v. Kansas City Light & Power Co., 302 Mo. 475.] When appellant's right to file a new abstract is thus upheld, no discussion of the sufficiency

of the original abstract filed in Division Two has any proper place in the opinion.

Assuming, as suggested, that Court in Banc and both Divisions have repeatedly held that when our rules say the evidence of the witnesses *shall* be printed in narrative form we mean such evidence *may* be printed in narrative form, I think it is high time we amend our rules so that we will no longer have to do violence to the English language to avoid the harshness of the rule.