PHELPS *v.* BEARD.

1. WILLS—MENTAL INCOMPETENCY—UNDUE INFLUENCE — DIRECTED VERDICT.

In a will contest on the ground of mental incompetency and undue influence, there being no duty upon the trial judge to weigh the testimony, his action in directing a verdict for proponent, to be justified, must have been based on a lack of any competent evidence to submit to the jury on said questions.

2. SAME—OPPORTUNITY FOR UNDUE INFLUENCE.

The extreme age of the testator, and the fact that at the time the will was made he and his wife were living with the proponent as members of the family, *held*, to entitle the contestant to a very careful scrutiny of the proof submitted.

3. SAME—EVIDENCE—SUFFICIENCY—DIRECTED VERDICT.

Evidence of mental incompetency and undue influence, *held*, insufficient to go to the jury.

4. SAME—EVIDENCE—SUFFICIENCY—INFERENCES.

While undue influence may be established by indirect and circumstantial evidence, it must be of such a nature that the inference may fairly be drawn therefrom that such influence was in fact exercised; mere opportunity for its exercise being insufficient.

Error to Montcalm; Davis (Frank D. M.), J. Submitted January 7, 1920. (Docket No. 22.) Decided February 27, 1920.

Walter S. Phelps presented for probate the last will and testament of John Williams, deceased. The will was allowed in the probate court, and Jennie V. Beard appealed to the circuit court. Judgment for proponent on a directed verdict. Contestant brings error. Affirmed.

*Griswold & Cook* (*Isabella R. Ganton,* of counsel), for appellant.

*Frank A. Miller* and *Hawley & Eldred,* for appellee.

On the question of inference of undue influence from meretricious relations between testator and beneficiary, see note in 17 L. R. A. (N. S.) 477.

SHARPE, J. The last will and testament of John Williams, an aged resident of Montcalm county, was admitted to probate on the 9th day of May, 1918. Jennie V. Beard, a daughter of the testator, appealed from the order of admission to the circuit court. After the testimony in that court had all been submitted, the jury, under the direction of the trial judge, rendered a verdict affirming such order. The contestant brings the matter here for review, the allegations of error all relating to such action of the trial judge.

The claim of the contestant is that there was competent testimony tending to show the mental incompetency of the testator to make a will, and also that undue influence had been exercised over him in its execution. The trial judge, in directing the jury, said:

"In this connection I want to say to you there is no sufficient evidence in this case to warrant the jury in guessing at whether he was competent or not. There is no sufficient evidence to indicate that he was not competent to make a will. The proof is otherwise. The testimony even on the part of the two contestants substantiates that view in my opinion. Many times discussions were had reaching right up to a point even after the time this will was made in relation to his business matters with them and his dealings with them, whether they owed him or not, when they did to balance up or give notes, what he said at various times about selling some of his land and buying other lands, measuring up values, everything on the part of the contestants in the testimony goes to strengthen the view that he was competent to make a will. He could take into consideration the extent of his property, the ordinary methods of doing business, that he expressed himself as to how he wanted the property to be taken care of, offering to sell and a refusal on the part of the contestants to accept the offer, his discussing the fact that he had made a will and was here at the judge of probate's office in the presence of other parties and how it was done. It seems to me that for a man of eighty-three years old he was possessed

of that vigor, mentality and capacity necessary to make a will.

"There is one other question left and that is the question of whether undue influence was exercised upon him, whether any question of evidence ought to go to the jury or whether it was simply a suspicion or a guess. In order to be undue influence it must be influence exerted over his mind that he did not make a will according to his intentions. In other words, somebody else's will or mind was substituted for his by coercion or by not—not always easy to define that so it is understood by the layman, but it must be something that operates upon his mind to lead him away from his own intentions and make it the will of those that had influence over him. Simply kindness to him, or his being there at the home of other parties, or having an opportunity is not sufficient, standing alone, of itself to indicate undue influence was used.

"I find an absolute lack of proof in this case to leave to the jury for them to guess at or presume there might have been undue influence used. There must be some substantial testimony to be submitted to the jury' and for them to say how strict or how much it would be.

"I think this case lacks that quality of testimony to submit to the jury."

As this is not a case in which the duty rested on the trial judge to weigh the testimony, but his action, to be justified, must have been based on a lack of any competent evidence to submit to the jury on the questions presented, it becomes the duty of this court to carefully examine the record. The extreme age of the testator, and the fact that at the time the will was made he and his wife were living with the proponent as members of the family, entitle the contestant to a very careful scrutiny of the proofs as submitted.

The testator had but two children, Mrs. Phelps and Mrs. Beard. In 1912, apparently with the consent of these daughters and their husbands, he made a will, in which he devised all of his personalty to his wife. He at that time possessed two farms, on which the

daughters and their families severally lived. This will provided that his wife might live with either daughter, as she might choose, and that the other should pay her $12.50 per month so long as she lived. A joint life estate was devised to Mrs. Phelps and her husband of the 100 acres of land on which they lived, with remainder over to their children then living. A similar estate was devised to Mr. and Mrs. Beard in the 80-acre farm they were then occupying, with a similar remainder over. There was a provision that, in case of the death of a grandchild with issue, such issue should take the share of the child. This will was drawn by Mr. Griswold at his office in Greenville.

The will admitted to probate was prepared by Mr. Miller, the prosecuting attorney then and now of Montcalm county, at his office in Stanton, May 28, 1917. He testified that Mr. Phelps came to the office with testator, but left before the will was talked about. After giving instructions about it to Mr. Miller, testator went out. The will was prepared, but before execution Miller met testator on the street and he told him of a change he wanted made therein. A new will was prepared by Miller and executed by testator, at his request, in the back part of a store, as it tired him to climb the stairs. This will differed from that executed in 1912 in that it gave to Mr. and Mrs. Phelps the fee title in the 100-acre farm. It gave the remainder over in one 40 of the Beard farm to one of the Phelps children and provided that, in the event of the death of the Beard child, they having only one, before his father and mother, the remaining 40 should go to the then living children of Mr. and Mrs. Phelps. It charged the land devised to Mr. and Mrs. Phelps with the support and maintenance of the testator's wife during her life. The material difference between it and the one earlier drawn on the same day was in the

provision relative to the one 40 of the Beard 80 going to the Phelps children in case of the death of the Beard child before his father and mother. In the first will drawn that day, the remainder over was devised to the Beard child unconditionally.

We have stated the provisions of these several wills at some length, as counsel for contestant insists that the last will is so unfair to the Beard family as to raise an inference that its execution was procured by undue influence. It should also be stated that Mr. Beard had made very considerable improvements on the 80 acres, as he claims in reliance on the provisions of the 1912 will.

The testator died on March 18, 1918. Mr. and Mrs. Phelps had four children and, as before stated, Mr. and Mrs. Beard had but one. There is considerable testimony tending to show that the relations between testator and Mrs. Beard had not at all times been very friendly. The testator was 82 years of age at the time the 1917 will was made. In 1907 he had had a severe illness, and his life was despaired of. He was afflicted with Bright's disease and heart trouble. The physician who then attended him, Dr. Black, died before 1917. Dr. Pinkham, of Belding, who had consulted with Dr. Black in 1907, prescribed for him at his office from time to time. In October, 1917, he was called to attend him at the home of Mr. and Mrs. Phelps. He testified:

"At that time he was very feeble, he didn't have good control of his bladder and bowels; he was sitting in the room, and seemed like a feeble old man. His mind was showing signs of feebleness at that time but not so far advanced as the feebleness of his body. * * *

"I saw him again in November and December, 1917, once in each month, I believe. His physical difficulties were developing gradually, getting more and more embarrassed about his bowels and kidneys and blad-

der. That physical condition troubled his mind, it
irritated him. He was anxious to pass on or to get
relief; he felt he was too miserable to enjoy life un-
less he could be cured. He remarked to me once or
twice in 1917 that he desired to have this life end
and end his troubles; I think when I saw him at the
farm and the last time I saw him in Greenville; that
would be in October and December; he said he wished
it might be over.

"He was afflicted with a complication of diseases;
heart trouble, kidney disease and prostatic; those are
usually allied. The effect of those diseases continuing
for a period of years upon a man's mentality depends
upon how old he is. At the age of eighty and past
it renders him more and more incompetent, emotional,
peevish and dissatisfied. I do not know that they have
any particular effect upon his will. I don't know as
that would affect his determination or positiveness of
character; as to whether it would affect his compe-
tency I would not feel able to make a statement.
After suffering from this complication of diseases for
a period of years, he would not be as competent men-
tally as he was prior to his suffering.  *  *  *

"When Mr. Williams was in the fulness and ma-
turity of his powers he was a strong man physically
and intellectually, a man that had quite a high degree
of intelligence for a man that had never had any col-
lege education.  *  *  *

"On the last occasion when I saw him, in December,
we didn't have much talk only about his disabilities.
*  *  *  He stated in a clear and definite way his
symptoms and his conditions. I did not discover in his
talk at that time any sign or symptom of hallucina-
tion. I did not discover at any time that he was en-
tertaining any delusions. He always talked in a clear
rational way whenever I saw him. He did not talk
much to me of his personal private business affairs,
very little. He was apparently a man who was close-
mouthed about his business affairs. That trait of
character remained with him as long as he lived so
far as I know.  *  *  *

"Upon each occasion his mind was entirely clear in
regard to the matters he was talking to me about—
his wife and himself. He talked in a logical and

straightforward manner on each occasion, both in October, 1917, and the preceding date.  *   *   *

"*Q.* Outside of the matter of forgetfulness, did you note any other symptoms subsequent to that illness of 1907?

"*A.* No.

"*Q.* His mentality was the same except he became slightly forgetful?

"*A.* Yes, sir.   *   *   *

"At the time I saw him six months or a year before October, 1917, I considered his mind was in normal condition for a man of his age.

"*Q.* At that time did he possess sufficient memory and mental capacity to know who the natural objects of his bounty were, that is, his two daughters, and the amount and extent of his property, and carry it in his mind long enough to make a will of two or three pages?

"*A.* I should think so."

We have quoted the doctor's testimony at considerable length.   The other witnesses testified to his failing memory and incidents peculiar to advanced age in many persons, such as repeating things said by him and worry over his physical condition.

It appears that Mr. and Mrs. Beard were informed by Mrs. Phelps some little time before the will was made in 1917 that the testator was talking about changing his will.   On the morning of the day this will was drawn, she told Mrs. Beard over the telephone that she was going to Stanton to see about some matter in which she was acting as a guardian of one of her children and that "father and mother are going along to fix this business."   The first positive knowledge the Beards had of the new will was about July 8th.   The testator talked with both of them about it, and, as they were dissatisfied, he asked them to meet him and Mr. and Mrs. Phelps at Stanton and see if it could not be "fixed up satisfactory."   They did so meet at the office of the judge of probate, and one cannot read the testimony of what there occurred

without being fully satisfied that the testator knew what he was doing and was making a great effort to satisfy the Beards that he was doing right in the changes he had made in his will. He visited the Beard farm several times after that.    Mrs. Beard testified:

"On the last occasion he was there, November 9, 1917, he broached the subject to us about his papers, he said the north forty there was turned back, that is go back to Walter's children. I told him if that paper was to stand we couldn't settle it up.    He said Walter's folks would not give us any trouble if we did not them, he did not want us to have any trouble over it. I do not remember of anything else."

On the occasion of a former visit, before the meeting at Stanton, she testified:

"*Q*. Well, so far as you knew then, your father still remembered what was in that will on July 8th, that he had that talk with you at your house?
"*A*. I suppose he did.
"*Q*. Well, he told you so, didn't he, told you that north forty was turned back to the Phelps' children after you were through with it?   He remembered that, didn't he?
"*A*. I suppose he did.
"*Q*. He still remembered it on November 9th, when he was there at your place?
"*A*. I think he did.
"*Q*. He told you so. didn't he?
"*A*. Yes, sir."

Counsel for contestant, in a carefully prepared brief, and also in their oral argument, review the last years of the life of the testator at length, and urge that the incidents to which they call attention, when considered in connection with the fact that the new will is an unfair and inequitable division of his property among his children, present sufficient proof, both of a lack of mental capacity and undue influence, to entitle them to go to the jury on both these questions.

The business transacted by the testator after making this will, and the fact that, understanding it, he made so many efforts to satisfy the contestant that he was doing what he thought fair and equitable, negative the first claim made.  There is not a scintilla of direct proof of undue influence.  It is true that, as the testator and his wife lived with the Phelps family, the opportunity existed therefor.  While undue influence may be established by indirect and circumstantial evidence, it must be of such a nature that the inference may fairly be drawn therefrom that such influence was in fact exercised.  The character of such proof and the rules of law governing it are discussed at length by Chief Justice BROOKE in *Re Williams' Estate,* 185 Mich. 97.  We content ourselves with a reference to this case, in which many authorities bearing upon the questions presented are discussed and analyzed.

Further quotations from the testimony of the witnesses will serve no useful purpose.  We are convinced, after a careful examination of the entire record, that the action of the circuit judge in withdrawing the consideration of these questions from the jury was justified.

The judgment entered in the trial court is affirmed.

MOORE, C. J., and STEERE, BROOKE, FELLOWS, STONE, CLARK, and BIRD, JJ., concurred.