## COULTER v. SMITH.

1. CANCELLATION OF INSTRUMENTS—DEEDS — UNDUE INFLUENCE — MENTAL INCOMPETENCY—EVIDENCE—SUFFICIENCY.

In a suit to set aside a deed on the grounds of undue influence and mental incompetency, evidence *held*, sufficient to justify the action of the court below in dismissing the bill.

2. SAME—ESTATES OF DECEDENTS.

The mere fact that decedent so disposed of her property as to do an apparent injustice to one or more of her children will not nullify the transaction.

3. SAME—UNDUE INFLUENCE.

> Undue influence cannot be predicated upon mere opportunity for its exercise

Appeal from Cass; Des Voignes (L. Burget), J. Submitted April 13, 1920. (Docket No. 42.) Decided June 7, 1920.

Bill by Addie S. Coulter and another against Charles L. Smith and another to set aside a deed on the grounds of undue influence and mental incompetency. From a decree dismissing the bill, plaintiffs appeal. Affirmed.

*Thomas J. Cavanaugh* and *Asa K. Hayden,* for plaintiffs.

*Clarence M. Lyle,* for defendants.

STONE, J. The bill of complaint herein was filed August 23, 1918, to set aside and cancel a deed executed and delivered January 23, 1917, by Charlotte Smith, now deceased, to the defendant Charles L. Smith, upon the grounds that at the time of the execution and delivery of the deed the grantor was unduly influenced by the grantee, and also that the grantor was at the time mentally incompetent to execute and deliver the deed. The controversy is over a house and lot in the village of Cassopolis of the value of approximately $2,500, being the then homestead of Charlotte Smith. The case presents mainly questions of fact.

Charlotte Smith died intestate June 17, 1918, about one year and five months after the execution and delivery of the deed in question. She was a widow, her husband having died in 1910. At the time of her death she was 85 years of age, and had resided at Cassopolis for about 60 years. She left surviving her, as her

sole heirs at law, three children: the plaintiffs, Addie S. Coulter, aged 66 years, residing in Cassopolis; Charlotte S. Varley, aged 64 years, residing in New York city, and defendant Charles L. Smith, aged 55 years, residing at Rice Lake, Wisconsin. The plaintiffs are both married women having no children. The defendants—husband and wife—have two children. The deceased, aside from the homestead, owned two other lots with houses thereon in said village, which she rented. They were inventoried in her estate at $1,800. Money, household goods, and so forth, brought the total of the estate to approximately $2,600, aside from the property here in controversy.

Upwards of 25 witnesses testified in the case, and it would be impracticable to attempt to even digest their testimony here. At the close of the hearing below, the learned circuit judge was of the opinion that the plaintiffs had failed to support either of their claims by the evidence, and believing them to be entitled to no relief, in an oral opinion he analyzed the evidence and dismissed the bill, signing a decree on May 16, 1919. It appeared later, however, that the stenographer did not take down what the court gave as its reasons for dismissing the bill, hence, on July 26, 1919, the circuit judge filed a written opinion in the case, being, as it will appear, subsequent to the date of the decree. This course is very much criticized by plaintiffs' counsel. We see no objection to the course pursued under the circumstances. In fact, we think that the practice of stating the reasons upon which the decree is based, in all cases, is to be commended.

The defendants were married in 1902, and since their marriage have resided at Rice Lake, Wisconsin, where defendant Charles L. Smith is the station agent of the Soo Line. He testified that he had been a "railroad man" since 1881. He had not visited his mother

for some two or three years prior to January, 1917, but his mother was in correspondence with the defendants and their children, and she had visited defendants' family on at least two occasions. In a joint letter to the granddaughter and the defendant Mae Carr Smith, bearing date January 14, 1917, Mrs. Smith, the mother, said:

"I am glad Charlie is coming, as I have something to offer him."

Soon after, and in January, 1917, defendant Charles L. Smith visited his mother in Cassopolis, and the deed in question was executed and delivered. He was there about one week in all, at that time, and made his home with his mother at the homestead. He testified fully as to what occurred, so far as he was competent. The deed was prepared at the request of the defendant Charles L. Smith by C. M. Lyle, who was afterwards the attorney for the defendants in this case.

As was said by the circuit judge in his opinion:

"Standing alone and without explanation the circumstances might make the question of undue influence debatable. However, the evidence discloses beyond question: (1) That the son (the defendant) visited his mother in response to a letter she had written him. (2) The letter states that she 'has something to offer him.'"

The circumstances surrounding the drafting and execution of the deed are not in dispute and appear in the testimony of Mr. Lyle. The express consideration in the deed is "the sum of one dollar and love and affection." And the deed contains the following clause:

"Reserving and excepting a life estate in said premises for and during the natural life of said grantor, Charlotte Smith."

It clearly appears, and we think is undisputed, that

defendant Charles L. Smith paid his mother for the deed a money consideration of $500, and he has paid the subsequent taxes and insurance upon the property. The checks for these amounts are in evidence, and we think are sufficiently identified and verified. Testimony of C. M. Lyle was as follows:

"I drafted Exhibit 4, the deed in question. I am an attorney at law and was on January 23, 1917. On that day, Charles Smith came to my office and gave me the data for drafting a deed for the homestead property that his mother occupied. He came in the forenoon. I went to the register of deeds office and got the correct description, drafted this deed during the forenoon and after dinner, sometime, I went down to the residence of Mrs. Charlotte Smith. While going there, I met Rev. O. P. Miller and asked him to accompany me. We went in the house. Charlie Smith and his mother were there. I read this over to Mrs. Charlotte Smith and asked her if that was the deed she wanted to make to her son. She said it was. I asked her if the correct consideration in the deed, one dollar and natural love and affection, was what she wanted placed therein and she said it was. Mrs. Smith signed this deed in my presence, after which I signed it as a witness, and Rev. O. P. Miller signed as the other witness. I took the acknowledgment of Mrs. Smith then and there. This deed was handed by me to Mrs. Charlotte Smith and in turn was handed by Mrs. Charlotte Smith to Charles Smith. At the time that she delivered this deed to Charles Smith, she told him to put it on record and if—I think she said, 'If Ad. (Addie) don't like it, I want her to do something while I live.' Mr. Miller and I stayed in the room a few minutes, I don't remember how long, and we got up and went out. O. P. Miller, the other witness to this deed, is deceased, having died last year since the making of the deed. I never saw that deed afterwards until Charlie Smith brought it to my office some time this year, 1919. That is all I care to state.

"*Cross-examination:* Mr. Smith came to my office, yes, sir. There is one thing more, excuse me. Mrs. Smith asked me how much she owed me for drafting this deed and I told her I would settle with Charlie.

Charlie did not settle with me. I didn't charge him anything. He offered to. He came to my office and I made the deed all out in my office, the reservation and everything in there in the forenoon and went to dinner from my office and went down there in the afternoon and got Mr. Miller on the way and took him in there, and the deed was signed and delivered to her and she delivered it to Charlie, that is correct. Charlie did not go out with me. I saw him again before he went away, but as to when and where, I have no recollection. I never saw the deed afterwards until he brought it here. I am sure about that. He did not walk up to my office with me and go into my office. Elder Miller and I went out together. I put the notarial seal on it before I went down there. I did not have it all executed before I went down. It was not signed. The seal was on. There is another thing now I am not certain about that whether I carried the seal with me at that time or not. I know, in some instances, I put that seal on beforehand and some I take it with me, and I am not certain. I think in this case it was put on in my office. I had not talked a word about this deed to Mrs. Smith before I went down there. I have not told all that was said while I was there. I have told all that I remember of, yes, sir. Miller and Mrs. Smith talked and Charlie talked. We didn't stay very long, but what was said I have no recollection. I did not go to the register of deeds office with Mr. Smith. I was not in there at all.

"This deed was acknowledged January 23d, and it appears it was recorded January 27th, four days later. I am not related to Mr. Smith except by marriage. I am a distant relative of his wife—her father and myself are second cousins, that is, Judge Carr and myself."

There was testimony that in prior years Mrs. Smith (the mother) had said to different persons that she expected to divide her property equally among her three children; and it appears that as early as November 22, 1910, she had written her daughter, Mrs. Varley, one of the plaintiffs, a letter, in which she said:

"Would you like to live in this house, rent free, as long as you want it, or would you rather have it sold

and divide with Adelaide and Charlie when I leave, for I don't expect to stay long?"

Again, in another letter to the same party, under date of January 11, 1911, she said:

"I have been thinking for some time if anything happened to me, would you like to live in this house where I am living now, rent free, as long as you want to live in it, or would you rather have it sold and divide it with Charlie and Adelaide and yourself. Charlie and Add. have good homes, so think about it."

Also, in another letter to the same party, bearing date February 1, 1914, she said:

"What I would like, if you would like to live in this house as long as you like just as it is furnished, rent free, as long as you want to live in it, then sell and divide with you three. I don't think Charlie will live long the way he looks."

Upon this branch of the case much stress is laid by counsel for plaintiffs upon these statements and letters. On the other hand, it is urged that the making of the deed in question was a very natural act; that having offered the property to the daughter living in New York, who did not accept the offer, she later offered it to her son, who accepted it, and paid her $500 in cash for it, and relieved her of the burden of taxation and insurance, and probably some repairs, as appears by other checks in the record, she retaining a life estate in the premises. It also appears that she was at that time in need of money. She continued to live in the homestead, and, in fact, died there, having spent some little time with her daughter, Mrs. Coulter, the winter before.

The principal reasons which she ever gave for making the deed of the property were testified to by the witness Mrs. Boyd, who testified as follows:

"I never asked her any questions about her property, but she—let's see, she told me a year ago last

month that she had made—she had sold her home. I was very much surprised when I heard it. I says, 'Sold your home?' I says, 'Who to?' 'Why, Charlie, my son Charlie.' 'Well,' I says, 'what is your object?' 'Why,' she says, 'my object was I needed money, could use it to good advantage, and I sold it for the sake of having money,' and says, 'Charlie is the only one that has got any children and you know blood is thicker than water.' * * * I don't remember now what else she said. That was the first time that I ever knew of it, a year ago the first of April. I don't think we ever talked about it afterwards. As to whether she ever talked anything about her children. She said that Mrs. Coulter was well fixed and didn't need it, and so was Mrs. Varley—at the same time she told me this—said that what she worked hard for she would like to have stay in the family, longer than it would if she gave it to them."

It is apparent from this record that there had been some friction at times between the mother and the plaintiff Mrs. Coulter, although the former spent some time with that daughter in the latter's home.

In a letter to her son Charles, dated March 22, 1917, she said:

"Don't mention the price to anyone what you paid. If you did not tell Lyle the price, no one knows. If anyone asks me I'll say I got my price."

Again, under date of February 16, 1918, in a letter to her son, she said:

"I hope neither one of you have told the price you paid, if you have the Coulters will hear. Add. (Addie) asked Mr. Carr if he made out a deed and he said no. She don't think I know that. Add. told me not to borrow any money of Charlie for they would lend me all I wanted. I told them I had not borrowed any and did not expect to. I can't put it all on paper. The summer tax was not in your name. I paid that, and that is all right."

The plaintiff Mrs. Coulter, in her cross-examination, testified as follows:

"I never would have brought this suit if it had not been I wanted to find out how much he gave for it, and this was the only way to do it.

"*Q.* Well, his answer was filed several months ago in which he stated how much he gave, did he not?

"*A.* Yes, sir.

"*Q.* You know that he gave at least $500, did you not?

"*A.* Well, that is what he said he gave.

"*Q.* You still question it, don't you, that he gave $500?

"*A.* I still question it now? No, sir. I first learned that mother had deeded to brother Charles I think about nine or ten months afterwards in the year 1917. I talked to my mother about it. She told me at that time she sold it to him, and another time that she gave it to him. That is all she said, and I don't recall what I said in reply. * * * Now, my mother said at that time: 'Now, I can have everything I want, I can have a horse or a housekeeper, or anything I want.' I said, 'Well, isn't that nice,' that was the reply I made to her."

The deed was placed on record and was recorded on January 27, 1917, being four days after its date, and the defendant Charles Smith told the register of deeds not to publish it.

There is conflict in the evidence as to the mental competency and mental stability of the mother, Mrs. Smith. While there was testimony tending to show that in her later years she was bodily afflicted, yet it appears that she remained in charge of her home and her business down to the time of her last sickness, which was only a few weeks before her death; the death occurring about a year and a half after the execution and delivery of the deed in question. The deceased died from heart failure. She had been afflicted for some time with a numbness in her hips and legs which was followed by poor circulation. We do not find that this affected her mind in any perceptible degree.

From a careful reading of the record, including the numerous letters written by her covering a period of many years, we are satisfied that by a great preponderance of the evidence it is shown that the mother retained her faculties in a remarkable degree; that she managed her business affairs with a great deal of care and persistency, down to and within a few weeks of her death. She was possessed of strong characteristics and a dominating will. After the making of the deed a fire occurred damaging one of the other houses owned by her. She collected the insurance, and had the repairs made. During the course of the work on repairs she seemed to have some trouble with the carpenters, some of whom were witnesses in this case, and testified to her childish conduct. A careful reading satisfies us that she was persistent in her economy, at times almost to stinginess, and the difficulty which she had with the carpenters arose because of her being so particular in having them exercise economy in the use of lumber and materials that went into the repairing of this house. There is evidence that she became lost in the village on one or two occasions. It is explained by showing that she was in search of a lumber yard that had been recently moved, and she had made a mistake in its new location. Her son-in-law, William Coulter, testified, in speaking of the mother, as follows:

"She was ordinarily a refined woman in her appearance and in her talk. She did her own housework, except my wife helped her some—I suppose she did. I wasn't there. I used to go to her place to eat dinner occasionally. She prepared the meals. My wife helped her if we were both there. As long as she lived, I went down quite often to dinner, and I have been other places where she would be invited, and she always went to the table and kept up her part of the conversation."

Another witness testified:

"She was the best boss amongst them. She was competent in every way. She was always ready to work and did work, and her conversation was good. I think she was as mentally competent as any of her relatives. She was smart and she always had her way."

Another of plaintiffs' witnesses, Mrs. Anna Alexander, who treated the mother with an electric vibrator for the numbness in her feet and limbs, which was in the spring of 1916 or 1917, testified:

"She seemed just as rational and bright as she ever did. At this time when she was afflicted." * * *

On cross-examination the witness testified:

"I was to dinner parties with her a number of times. I was at Mrs. Boyd's where she was. I don't remember now whether I was at any other places with her or not. She came there herself and took part the same as any guest at these various dinners. I have been at her home many times. I thought she kept her house in good condition, nicely for a woman of her age, a remarkable woman in that respect, I think she was; and with reference to her person and clothing, she was always neat in general appearance. She was an ordinary lady in appearance for a woman of her age—as to whether she was more than ordinary, as you ask—she had a good appearance. She lived alone when I knew her and did her own work so far as I know. I heard her tell about raising chickens and she tried to sell chickens. * * * I would regard Mrs. Smith as a mentally competent person. She was no different than the ordinary person in the usual walks of life that she was in, that I know of."

Much more testimony might be quoted to the same effect. It is only fair to say, however, that there was other testimony to the effect that she was weak and childish during the last years of her life, but we find very little evidence that would justify the claim of counsel, "that she was a nervous, shaky, feeble old woman who was easily cajoled and persuaded." In

our opinion, the clear weight of the testimony leads to the opposite conclusion. Counsel for plaintiffs have cited and quoted from the following cases: *Noban* v. *Shoup*, 171 Mich. 191; *Jacox* v. *Jacox*, 40 Mich. 473 (29 Am. Rep. 547) ; *Duncombe* v. *Richards*, 46 Mich. 166, 171; *Whiteley* v. *Whiteley*, 120 Mich. 30. In our opinion these cases are not controlling or applicable to the questions here involved, under the evidence.

Some complaint is made by counsel for plaintiffs in the rulings of the court upon reception of the evidence. We have examined the record in that connection, and while some of the rulings were near the border line, especially upon the question of the competency or incompetency of Mrs. Smith, the mother, yet we think there was no prejudicial error in the rulings.

Some complaint also is made of the remarks of the court in receiving the testimony, but it should be borne in mind that this was a chancery case. There was no jury present, and the court passed upon the weight of the evidence. We should bear in mind the rule that has been recognized in this court, as follows:

"Sanity is the rule; insanity, the exception; and when it appears that a witness has known a person for a long time, and has never known anything unusual, either in his speech or actions, he is competent to express an opinion that the man is sane, because sane or normal acts and speech are consistent with the normal condition, sanity. Insanity, however, not being a normal condition, before one is competent to say that another is insane, he must state some fact that is inconsistent with sanity; and this is not done until the witness is able to testify to something that a man has said or done which fairly tends to show insanity." *Lamb* v. *Lippincott*, 115 Mich. 611, 617.

See, also, *People* v. *Borgetto*, 99 Mich. 336: *In re Walsh's Estate*, 196 Mich. 42, 73.

We concur in the concluding words of the opinion of the court below:

"The weight of testimony of her neighbors and acquaintances of years' standing affirmatively establishes the fact that up to within a few weeks of her death she was mentally strong and unusually vigorous for one of her age. Complying with this her letters written expressing her wishes so clearly and naturally on the subject, impress me with the opinion that she fully comprehended the nature and provisions of the deed made a year before her demise; that she told some of her neighbors about it, and further that she desired this homestead should be the property of her son, and that in the natural course of events, ultimately descend to her grandchildren, the son alone having children of the family tree.

"Again, it is not successfuly disputed, in fact the record affirmatively disclosed, that there was a money consideration of at least five hundred dollars, and taxes paid by defendant, for the property covered by this deed. It follows that in my opinion this deed should not be disturbed and the bill of complaint should be dismissed."

In conclusion, it is sufficient to say, we are satisfied that by the overwhelming weight of the evidence it appears that the transaction to set aside which this bill was filed, was brought about and conducted by Mrs. Smith, the mother, in the exercise of her own independent will and judgment; that her mind dominated and controlled the transaction; and that the deed was executed and delivered deliberately, and it was purposely intended thereby to bestow the property in question upon her son. Whether this was wise or unwise, is not a question before us. The mere fact that a decedent so disposed of property as to do an apparent injustice to one or more of her children, will not nullify the transaction. Undue influence cannot be predicated upon mere opportunity for its exercise. *Blackman* v. *Andrews,* 150 Mich. 322; *Pritchard* v. *Hutton,* 187 Mich. 346, 359.

Courts are not permitted to make equitable distribution of estates, but are concerned only in giving

effect to the legal acts of testators and grantors. *Price v. Hagle,* 171 Mich. 455; *Reichert v. Reichert,* 144 Mich. 295; *Terry v. Terry,* 170 Mich. 330; *Keller v. McConville,* 175 Mich. 479; *Phelps v. Beard,* 209 Mich. 266.

The decree of the court below will be affirmed, with costs to the defendants.

MOORE, C. J., and STEERE, BROOKE, FELLOWS, CLARK, BIRD, and SHARPE, JJ., concurred.