EVELINE D. WOODMAN, Appellant, v. OSCAR W. MORGAN,
Appellee.

**WILLS:** Mental Competency and Undue Influence—Evidence. Evidence
held to present no jury question in a will contest as to the mental
competency of the testator, or as to any undue influence in the execu-
tion of the will.

Headnote 1:  40 Cyc. pp. 1331, 1332.

*Appeal from Adair District Court.*—W. G. VANDER PLOEG,
Judge.

APRIL 7, 1925.

REHEARING DENIED SEPTEMBER 25, 1925.

NATHAN MORGAN died April 16, 1923. His wife had died in
1917. The two children of the family were Eveline D. Wood-
man and Oscar W. Morgan. An instrument purporting to be
the will of Morgan was filed and proposed for probate by the
son, who was the sole beneficiary under the will, except a bequest
of $5.00 to the daughter. The daughter objected to the probate
of the instrument, on the grounds that Nathan Morgan was men-
tally incapable of executing a valid will, and that said instru-
ment was the result of undue influence of Oscar W. Morgan.
The case went to trial to a jury. At the close of the evidence
offered by contestant, on motion of proponent, by direction of
the court, verdict was returned for proponent. Judgment was
entered on the verdict admitting the will to probate, from
which judgment, contestant appeals.—*Affirmed.*

*Lee & Garfield, P. L. Sever,* and *R. L. Bryant,* for appellant.

*Carl P. Knox* and *Paul G. James,* for appellee.

ARTHUR, J.—Nathan Morgan owned and lived on a farm in
Illinois until his daughter was about 25 years old and his son
21, and then moved to Iowa, and bought a farm in Montgomery

County, and lived there about 7 years; then he acquired a farm in Madison County, and lived there about 4 years; then purchased another farm south of the town of Stuart, in Adair County, and lived on it several years, until he purchased and moved into a residence property in the town of Stuart. In 1910, Morgan owned the farm near Stuart, consisting of 360 acres, and his residence property in the town of Stuart. He owned no other real estate. He then divided said real estate between the son and daughter, by deeding to Oscar 200 acres and to Eveline 160 acres and the residence property in Stuart, reserving the use of said properties during the lives of himself and his wife. The properties conveyed to the son and daughter were practically equal in value. What, if any, personal property Morgan then possessed, the record does not disclose. Mrs. Morgan died in May, 1917. On July 31, 1917, the will in controversy was signed. Morgan was then 87 years old. He lived some 6 years longer, and died at the advanced age of 93. Oscar was given a college education, and afterwards studied law, and was admitted to the bar, and practiced a short time. Except the time he was pursuing his college course, he lived with his father on the farms occupied by his father in Illinois and Iowa, until he was 45 years of age, when he married. He stayed on the farm which was conveyed to him and his sister, and assisted his father in running it from about 1893 to 1907. After her marriage, Eveline and her husband came to Iowa, and went upon a farm belonging to her father, with a partnership arrangement in carrying on the farm, which lasted for some time. Both the son and the daughter prospered financially. Eveline's husband died, and left her and her children in comfortable circumstances. On the death of the mother, the father desired Mrs. Woodman, who was then a widow, to live with him and make a home for him in the Stuart residence property, which he had deeded to her, and in which he had reserved a life estate. Negotiations were had between them. They failed to agree upon terms, and the father went to live in the family of Oscar, and remained there until he died.

The contest of the will was based upon two grounds: (1) that the testator was mentally incompetent to make a will; (2) that he was unduly influenced by his son, Oscar W. Morgan.

In their argument, counsel for contestant practically abandon the objection to the probate of the will based on mental incapacity, and urge that testator was susceptible to undue influence. Contestant produced as a witness Dr. H. F. Clark, who had been the Morgan family physician for many years before the will was signed, and who attended both Mr. and Mrs. Morgan afterwards, and during their last illnesses. Dr. Clark, in testifying concerning Nathan Morgan's condition of mind, stated:

"I never saw anything wrong with his mind at any time; he had all his faculties absolutely; he was an extremely bright old man."

About two years prior to the execution of the will, Mr. Morgan was ill with pneumonia. Contestant lays some stress upon that period of illness as impairing testator in body and mind. It does not seem to have been a severe case. Dr. Clark, who attended him, testified:

"I cannot say that during his sickness there was any danger. He went through a very normal case of pneumonia."

The doctor testified that Morgan "was always quite a hearty, hale old man,—above the average. He had no arterial sclerosis or high blood pressure."

Mr. Morgan was a very heavy man, weighing around 230 pounds. In his late years, his legs were stiffened with rheumatism, so that he got about with some difficulty. Dr. Clark testified that, during the pneumonia illness, he called upon Morgan every day, and that Morgan would personally pay him for each visit, or would hand his pocketbook over to his wife, for her to pay him. Dr. Clark also testified that, when he was called to attend Morgan after Mrs. Morgan died, Morgan would pay him personally, or would hand his pocketbook over to Oscar, with request to pay him. During the last few years of his life, Mr. Morgan's eyes were considerably dimmed, so that, when he went about town or elsewhere away from his home, he was accompanied by Oscar: although Dr. Clark testified that, during the last year or so of Morgan's life, he had seen him reading newspapers, and that he could go about alone; that he would come into his office and into the bank and other places by himself.

According to the testimony of Dr. Clark, Morgan died of old age, and not from any disease.

The evidence produced by contestant failed to show mental impairment of Morgan before or at the time the will was signed. The evidence offered did not even tend to show mental incapacity, but, on the contrary, established that Morgan was of sound and disposing mind at the time the will was made, and even afterwards, in his extreme old age.

It is urged, and argued with much skill and ingenuity, that testator was susceptible to undue influence; that proponent was disposed to exercise undue influence; that proponent had opportunity to exercise undue influence; and that the will indicates the exercise of undue influence. The contention that the testator was susceptible to undue influence is answered in the negative in the foregoing discussion of the mental faculties of testator. Without a setting forth of the evidence in detail, it is sufficient to say that the record discloses that Nathan Morgan was a man of strong mind and decision. He had a successful business career. He attended to his own business, without the assistance of anyone, until some time after the will was made, and until he reached an extreme old age. It does appear that at times he accepted Oscar's views about doing things on the farm. It was natural that they should counsel together concerning business and other matters; but it does not appear that Oscar or anyone else dominated him concerning the handling of his property or in other matters. Nathan Morgan was a strong man. He had a mind of his own. He was not susceptible of being influenced to do anything contrary to his own judgment in the premises. Neither do we find in the record any evidence that Oscar was disposed to exert undue influence over his father in any particular. Of course, Oscar had opportunity to sway the mind of his father if he were disposed to do so. They lived together until Oscar was 45 years old; and after that they lived together, or as near neighbors, until the father passed away. Mere opportunity does not prove that undue influence was exerted.

Contestant urges that the fact that the will bequeathed to Oscar all the property of which Nathan Morgan died possessed, and disinherited contestant, giving her only $5.00, shows that undue influence was exercised by Oscar. True, the inequality of

bequest is a proper matter to be considered. Other portions of the will may also be considered. After a disposal of the property in Paragraphs 1, 2, and 3, the fourth paragraph of the will reads:

"I have heretofore made distribution of my real estate by deeds of conveyance, making distribution of all of the same in that way, so that it is understood that the above refers to my personal estate only, and in construing and carrying out the provisions of this, my last will and testament, no consideration or attention whatever is to be paid to any advancement by way of deed of conveyance or payment of money to either of my said children, as I have taken the same into consideration in the making of the foregoing disposition of my said personal estate."

Bank accounts of Nathan Morgan's, showing deposits and disbursements over a period from the 1st of January, 1917, to February, 1923, were produced, and Oscar was examined concerning them. A bundle of checks found in a drawer where they were kept by Nathan Morgan was produced, and Oscar was examined about them. The checks produced were not all the checks mentioned in the accounts. Oscar was asked to explain what the several items of money checked out were used for. He told what some of the check items were for, but as to most of the items he disclaimed any knowledge. Of the checks produced which were signed "Nathan Morgan, by Oscar Morgan," he explained what the money was used for. The bank accounts disclosed total deposits in the amount of approximately $22,000. At his death, Nathan Morgan's estate consisted of approximately $4,000 in government bonds. The deposits in the banks represented income received from the land deeded to Oscar and Eveline, in which Nathan Morgan had reserved a life estate. Contestant allows against the deposits certain estimated debit items, such as taxes on the land and residence in Stuart, which Nathan Morgan paid, funeral and burial expenses, expenses of his living, and incidental expenses, and estimates that there is about $8,000 unaccounted for. Contestant contends, because Oscar, as a witness, failed to explain what the checks mentioned in the bank accounts were for, and especially some of the large items, that he had converted some of the funds to his own use; that Oscar was of a dominating disposition, and had exercised control

over his father in the handling of his father's money. The testimony of Oscar disclosed that he owned, besides the land given to him by his father, several tracts of considerable value and quite a large amount of personal property. It is urged that Oscar must have enriched himself from his father's funds, because Oscar's property increased and his father's funds diminished until there was only about $4,000 left at his death. The evidence showed that, while Oscar had occupied the 200 acres conveyed to him during most of the time, he had paid but little rental.

After the mother died, Nathan Morgan wanted his daughter to live with him and make a home for him in the Stuart property. . He proposed to pay her $30 a month for her services. She demanded $50. There was testimony to the effect that Oscar intruded, insisting that, if his father and sister were going to live together, Eveline should relinquish any interest in the estate. Contestant insists that this incident showed that it was Oscar's disposition to dictate to and influence his father, and especially in matters where she was concerned, and that he sought to alienate his father's affections from Eveline. But it did not appear that the father demanded of Eveline relinquishment of her interest in his estate, in connection with her coming to live with him. The deal was not consummated because the father would not pay her demand of $50 a month for her services.

Another little incident occurred shortly before the will was signed, which caused some irritation. Some trees on the property deeded to Eveline were cut down and made into stove wood, at the direction of her father. Eveline was displeased about this. Her son was about to take the wood away, or some of it, thinking that it belonged to his mother; and his grandfather refused to let him take it. This incident was not of a serious nature; and we doubt if it, or the failure of the father and daughter to agree upon an arrangement to live together, had anything to do with determining the father to give the remnant of his estate all to his son. But if they did, the evidence does not show, by any fair inference, that Oscar exerted any influence over his father in these matters. The record fails to show, by any direct testimony or any fair inference from cir-

cumstances, that Oscar at any time exerted undue influence over his father in any transaction. As we view it, the record discloses that the father was always, in the earlier days as well as in later times, disposed to render financial assistance to Oscar. He gave Oscar financial help all along. He gave Oscar a tract of Montgomery County land, long before the division of real property was made between Oscar and Eveline, and at a time when he was a middle-aged man, when not even Eveline would charge that he was susceptible of undue influence by Oscar or anyone else. No doubt Oscar profited through financial assistance given him by his father. Oscar turned out to be a good business man, and accumulated considerable property. In making his will, Nathan Morgan carried out the program that he had always pursued, of giving more to his son than to his daughter. But the evidence utterly fails to show that this was the result of any influence exerted by Oscar.

Complaints are made of rulings on evidence excluding certain testimony offered by contestant. It is unnecessary to consider these rulings in detail. We have carefully examined the record, and find no error. We may add that the testimony offered, if it had been received, would not have materially strengthened contestant's case.

Briefly stated, the relations between Nathan W. Morgan and his son were: Oscar lived in his father's home and assisted his father in his business of farming and stock raising until he was 45 years of age, without compensation. After his marriage, Oscar engaged in business for himself, but always lived near his father. Some 3 or 4 years after the division of real estate was made between Oscar and Eveline, and when Nathan Morgan was 83 or 84 years old, when he was becoming stiffened with rheumatism and his eyesight poor, he began to have Oscar go with him on business and other errands about the town and country, and would have Oscar write checks for him. Oscar went with his father to the law office of F. O. Hinkson when the will was drawn. The record does not disclose whether he remained at the law office and was present when the will was drawn, or not. After the mother passed away, Nathan Morgan lived with Oscar. It was natural that these relations should exist. Oscar performed the services which any son might be

called upon to do, and only that which any faithful son would perform. Oscar did not sustain toward his father a confidential relation, such as that of attorney, guardian, or confidential business manager; but rather, he assisted his father in the transaction of business as a clerk or amanuensis. The record does not disclose that he ever signed his father's name to a check or paid out any of his father's money without direction at the time so to do.

In determining the question before us, the case of *Vannest v. Murphy,* 135 Iowa 123, is helpful. In that case, among other things throwing light on the question before us, we said:

"For all that appears, he did no more than perform services which any child might be called upon by a parent to do. The mere fact that he looked after some business transactions for her, or signed her name to checks for her, did not constitute him her confidential agent in any such sense as to justify the inference that provision for him in the will was induced by undue influence."

See, also, *Christy v. Buttman,* 194 Iowa 262.

Giving to the evidence the most favorable interpretation and probative effect which it will reasonably bear, we reach the conclusion that contestant was not entitled to go to the jury upon the issues of the mental unsoundness of the testator or the exercise of undue influence over the testator in the procurement of the will, and that the court did not err in directing verdict for proponent admitting the will to probate.

The case is affirmed.—*Affirmed.*

FAVILLE, C. J., and EVANS and ALBERT, JJ., concur.