IN RE ESTATE OF ANDREW FRAZIER.
JOHN FRAZIER ET AL., APPELLANTS, V. ALEXANDER JAMES
FRAZIER, APPELLEE.

FILED MAY 19, 1936. No. 29537.

*Hoagland, Carr & Hoagland,* for appellants.

*Shuman & Overcash, contra.*

Heard before GOSS, C. J., ROSE, GOOD, EBERLY, DAY, PAINE and CARTER, JJ.

PAINE, J.

This is an appeal from the district court for Lincoln county, Nebraska, to reverse a judgment rendered on a

verdict of a jury admitting to probate a will executed on May 8, 1933, by Andrew Frazier.

The will gives the northwest quarter of section 17, township 13 north, range 30 west, lying near North Platte, in Lincoln county, Nebraska, to the brother of the testator, Alexander James Frazier, whom he names as executor. The will was witnessed by Dr. John S. Twinem, Claude R. Mercer, and Leroy E. Mehlmann. This will is contested by John Frazier, a brother, and Mrs. Anna Freiberg, a sister of testator.

Fifteen errors are relied upon for reversal; the ones argued at greatest length being that the court erred in withdrawing from the consideration of the jury the question of the mental competency of the testator, and that the court erred in overruling the challenge of the contestants to the jurors George Ledroyt and P. G. Buchanan.

At the same time that the will was executed, an agreement was entered into between the testator and Alexander James Frazier, the beneficiary under the will, who was usually called Jim, and his wife, Mary Rose Frazier, usually called Rose, with whom the testator had been making his home for some time, setting out that he desired to remain in their home and be cared for by them during the remainder of his life, and that he had that day executed a deed to this brother, Jim, in consideration of their caring for him and supporting him during the remainder of his life.

We will first consider the question arising in the selection of the jury. The contestants challenged the ruling upon the *voir dire* examination of the juror George Ledroyt, who testified that he knew Andrew Frazier, the testator, referred to as Andy, and his brothers, that is, the contestant and the brother who is the proponent, and had known them both for many years. He testified that he had never had any business transactions with Andy, or visited him at his home, but had just casually met him, but that it had been two or three years since he had talked to Andy; that he had no impression, one way or the

other, as to whether he was capable of making a will on May 8, 1933. After the court had reexamined the juror in detail in regard to some of these points, he overruled the challenge made to the juror. P. G. Buchanan, another juror, said that he had known Andy for 20 or 25 years, had met him on the street, chatted with him, and as far as he could see there was nothing wrong with Andy, but he had not talked with him for two or three years before the date the will was made, and that if he was selected as a juror he would not start out with any impression as to whether the will was valid or invalid, and would determine the case entirely from the evidence and the court's instructions. The challenge was resisted, and after examination by the court the challenge was overruled.

The question of the acceptance of a juror is one that is submitted to the discretion of the trial court. The appearance of the juror, his manner of answering, his attitude toward counsel as well as litigants, were all disclosed before the trial court, and a single statement which would, by itself, tend to disqualify him may be considered as a careless statement by the court, who, in going over the whole matter more carefully, elicited positive statements showing that the juror was not prejudiced, had no preconceived idea of how the issue should be decided, and that, if retained as a juror, he would arrive at his decision solely from the testimony of the witnesses and the instructions of the court. We do not find that the court in this instance abused his discretion, for the court is given a wide latitude in passing on objections to individual jurors. *Hinton v. Atchison & N. R. Co.,* 83 Neb. 835, 120 N. W. 431; *Taylor v. State,* 86 Neb. 795, 126 N. W. 752; *Ward v. State,* 58 Neb. 719, 79 N. W. 725; *State v. Bartley,* 56 Neb. 810, 77 N. W. 438; *Whitcomb v. State,* 102 Neb. 236, 166 N. W. 553; *Kadner v. Omaha & C. B. Street R. Co.,* 97 Neb. 678, 151 N. W. 169; *Jahnke v. State,* 68 Neb. 154, 94 N. W. 158.

The principal attack is made by the contestants in the case at bar upon the mental competency of the testator.

To pass upon this question, it is necessary to review the evidence presented in a bill of exceptions of 600 pages. This bill of exceptions lacks the certificate of the clerk of the district court, and this court is not required to consider it. *State Bank v. Bradstreet,* 89 Neb. 186, 130 N. W. 1038, 38 L. R. A. n. s. 747; *In re Estate of Abts,* 122 Neb. 714, 241 N. W. 270. But, waiving this for the present, we learn from the bill of exceptions that this testator, known by every one as Andy, was born in 1876, and was 58 years old at the time of his death. He was the youngest member of the family of six children, which included William F. Stack, a half-brother. When Andy was 18 months old he had a severe attack of spinal meningitis, from which he made a slow recovery, and which left him somewhat crippled in the feet, especially on the right side, and his affliction is referred to by some witnesses as infantile paralysis. By the time he was five years of age he was able to begin walking again, with the help of some vehicle, and by the time he was seven years of age he could walk fairly well. He attended both public and parochial schools, but never reached the eighth grade. He could not run and play as other children did, and had a slight impediment in his speech.

Andy stayed with his oldest sister, Mrs. Freiberg, a contestant, for many years. She testified that he was not strong, paid little attention to anything around the home, but she had not seen him but once or twice during the last five years of his life. In 1907 this sister, Mrs. Freiberg, moved to Denver, and Andy went to live with his sister Margaret, who had never married, and he lived continuously with her for 20 years in her home which her father had deeded to her in North Platte. When Andy became a man he was engaged in several jobs. He delivered ice for his brother for over ten years, and was a gatekeeper or ticket-taker at the Lincoln county fair for a number of years. Before 1912 Andy's father deeded him a 160-acre improved farm, worth perhaps $8,000 at one time, but worth about $5,000 when he died.

Margaret took very good care of Andy and he was greatly attached to her. She would go out to his farm with him, help him do business with his tenants, and would help measure up the hay, and assisted him in collecting his rents. There is evidence to the effect that Andy, when not otherwise busy, stayed around the yard, and that he enjoyed talking with the boys and girls of the neighborhood, and at times would carry trinkets and toys in his pockets. Exhibit No. 7, introduced in evidence, shows a picture of Andy and the proponent of the will and a brother-in-law returning from a prairie-chicken hunt, and the evidence shows that Andy did his part of the shooting and enjoyed this sport. He was all broken up by Margaret's death, and insisted that the doctor had killed her, as she had died suddenly following an operation. For a short time after the death of his sister Margaret he lived with a Mrs. Boyer, and he then stayed out on his own farm for a while, and his tenant did the cooking. Andy would drive a team, ran a mower, and at times did other work on his farm.

Several years after Margaret died, Andy's brother, Jim Frazier, the proponent of the will, who had been for many years a Union Pacific conductor, was transferred back to North Platte from Gering by the company. At that time Andy was living out on his farm with his renter, and one day they called up and said that Andy was very sick. Jim being out on his run, Rose went out immediately, and found Andy vomiting and lying on a cot out in the yard. She brought him to North Platte and called a doctor, who said he had ptomaine poisoning, and from that time on until he died he lived in their family. They looked after his every need and were very kind to him, and he told several how good they were to him.

At the time Andy was so sick, Rose did not know the address of Andy's oldest sister, Mrs. Freiberg, one of the contestants herein, as they had not corresponded, and Rose sent an air mail letter to the chief of police in Denver, asking him to locate Mrs. Freiberg and tell her

that Andy was ill. In response to a telephone message, Rose at once wired Mrs. Freiberg money to buy a ticket to come to North Platte to visit Andy.

Exhibits in the record show that Andy kept a checking account at the McDonald State Bank, and made deposits, and drew checks in settlement of his business deals.

The evidence for the contestants on the question of his competency to make a will may be summed up briefly, as follows: The brother Jack, the principal contestant, testified that Andy was not competent, and his sister Anna, the other contestant, said he was "not fit" for a number of years. A lady with whom Andy boarded after his sister Margaret died testified that he "was very incompetent." Another lady met Andy on the street near the depot one day and he gave her "a blank look," and answered that he knew her, but she is positive that he did not know her at first. She testified that, while they carried on a conversation on this occasion, he did not ask about her welfare, or about the children, or anything like he usually did.

Two osteopathic doctors, father and son, gave Andy some nine or ten osteopathic treatments to stimulate the nerves in the lower part of the spinal cord with various lights, etc. One of these doctors testified that he had formed an opinion as to whether any paresis had set in, and said: "His mental condition was a subsequent affair and that was one of general paresis in addition to what he had already suffered from;" and added that he was not competent. The son testified he had given three of the ten treatments. In answer to the question whether he noticed anything unusual in his actions or conversations, he said that Andy seemed to make unnecessary motions in adjusting his affected legs on the table, and that, while he carried on an ordinary conversation, there was at times an interruption in the continuity of his thought.

In a spirited discussion of this testimony, the attorney for the proponent uses somewhat the following language: Now, what right did either of these osteopaths have to

express any opinion? They are not alienists, or even physicians as we understand such. One testified that they do not pretend to practice medicine; that their treatments were to tone Andy up; that he followed directions; carried on ordinary conversation; that he was not insane; that no "subjective examination" was made. The other osteopath did not know which disease Andy had, and said that it was a "fixed affair" and "remained somewhat stationary, a lifelong affliction." He said he did not think "there are any particular stages" of paresis, and that Andy possessed the same disease he had when he was an infant. The counsel adds in his brief: "In view of this testimony and the complete omission of any foundation, expressions of opinion by this witness were clearly improper."

Now, in an examination of the proponent's testimony, the testimony of those present when the will is executed is entitled to the greatest consideration. *Forehand v. Sawyer,* 147 Va. 105, 136 S. E. 683. One of the witnesses of the will was Dr. John S. Twinem, who has been a practicing physician and surgeon in North Platte for 31 years, and who testified he had been acquainted with Andy during all that time, and that they always visited every time they met "like two Irishmen." He treated Andy in his last illness for kidney trouble, some prostate trouble and also high blood pressure. Andy died on January 23, 1934. The will was executed May 8, 1933. Dr. Twinem testified that he was asked to come up and witness the will that evening, and saw Andy sign it, and stated that he observed Andy at the time the will was signed and could not find any deviation from the normal mental status, and that he was capable of transacting business; that he did not see anything about his appearance or condition or conversation that would indicate that he was at all unbalanced mentally, or unsound in any respect.

The testimony of the other two men who witnessed the will was very positive to the effect that they noticed nothing that would indicate that Andy was mentally unsound when the will was executed, although he was not quite as strong physically as he had been.

William F. Stack, a half-brother of Andy, and a joint heir if the will is broken and the recipient of nothing if the will is admitted to probate, stated that he had known Andy all his life, as his mother married Andy's father and they were stepbrothers; that he had never seen anything to indicate that Andy's mind was abnormal until his last sickness, when his mind wandered at times.

Katherine Frazier testified that she was a divorced wife of the contestant John Frazier; that she had known Andy ever since she came to North Platte in 1883; that years ago Andy worked in the ice business for her husband for years. She said that he delivered ice, made out tickets, and collected cash when any one paid cash, and that he would always settle up on Saturdays. Mrs. Frazier testified that, just before Christmas, about a month prior to Andy's death, she stayed at the home of Mr. and Mrs. Jim Frazier while they were away and took care of Andy; that she got his meals for him, stayed with him all the time; that she did not see anything wrong with him mentally, and that they had a very nice time; that he was not in bed all of the time, but would be up and around, but did not go down-town; that her little grandson, Jerry, also stayed there with her the entire week that she was there, and that Andy and Jerry visited and talked every evening; that Andy said that Jim and Rose were taking care of him nicely, and that what property he had he was going to leave to Jim, and said, "Kate, I am sure a lucky dog."

Mildred Spillner, a registered nurse, who at the time of the trial was nurse in the public schools of North Platte, testified that during May, June, and July, 1933, she saw Andy twice a day, as she called to give feedings with a stomach tube to Rose Frazier's sister. She told of her visits with him, that she found him to be crippled in the feet, but otherwise to be a man of ordinary intelligence, and never saw anything to indicate he was abnormal or of unsound mind. Her visits covered the day the will was written.

It is clear from the evidence that the testator had a severe attack of infantile paralysis when he was a year and a half old, and that he lost the use of his legs, but gradually after several years regained the use of his legs, but as a boy did not have such use of them that he could play games and run and romp with the other boys, but as he reached manhood he could, and did, get about and work at several things, such as delivering ice and doing work on his farm.

During 20 years he lived with his sister Margaret in a very happy relationship. It is asserted that during these years she handled all his business matters for him. The evidence does show that she was a clever business woman and perhaps took charge of the renting and managing of the farm, although he was always along with her. This evidence does not indicate that he was not able to handle these farm matters, but that he had entire confidence in his sister Margaret, who talked all these matters over with him, and she was quick and capable, and Andy was glad to have her handle his matters. She doubtless knew Andy better than any one else ever did, and it is important to note that she not only willed her home to Andy, which would be expected, but that she made him the executor of her estate, which duties he carried out, and settled her estate. In Margaret's opinion he was able to handle business affairs.

Complaint is made that he did not get a job and hold it after he stopped working with his brother in the ice business. One answer to that is that he did not feel that he had to work, and was crippled in his feet. His wants were simple, he lived very economically. Our attention is called to the fact that after his sister Margaret's death he had trouble with his renters, and at times failed to collect all the rent due him from this farm. However, it can hardly be argued that the failure to collect farm rents since 1929 should be considered as a test of sanity.

It may be admitted that the proponents of the will took Andy into their home and treated him well, but there is

nothing to indicate that they would not have treated him as well if he had not possessed this farm. The verdict of the jury decided the question that there was no undue influence practiced by them.

On this evidence the trial court withdrew from the jury the question of mental competency. Let us examine some of the decisions in reference to this point. In *In re Estate of Gormly,* 188 Ia. 467, 176 N. W. 252, where a bachelor, aged 85, left the bulk of his estate to one nephew, and where the attending physician said that his mind was enfeebled to the same extent as his physical condition, but no abnormal derangement was shown, it was held that the evidence was wholly insufficient to have justified a verdict adverse to the will on the ground of mental incapacity, and that the evidence was insufficient to make that a question for the jury.

Another case in point is *Phelps v. Beard,* 209 Mich. 266, 176 N. W. 406, in which a doctor testified that the testator was 83 years of age, very feeble, and did not have control of his bladder or bowels, and was anxious to die, but his mind was clear outside of forgetfulness, but that he had sufficient memory and mental capacity to know the objects of his bounty and his property. The court instructed a verdict, and said there was no sufficient evidence to indicate that he was not competent to make a will.

*Gay v. Gay,* 183 Ky. 238, 209 S. W. 11, relates to a widow 68 years of age, owning valuable real estate and more than $30,000 of personal property. Her will was contested by three grandchildren. She placed great weight upon her dreams, and was influenced by them in some things. The court held that she made a rational survey of her property and disposed of it according to a fixed purpose, and that although an alienist testified that she had a form of insanity, still the evidence was insufficient to go to the jury upon the question of testamentary capacity where such mental disorder was not of a kind to invalidate a will.

In *Green v. Isaacs,* 178 Ky. 258, 198 S. W. 714, a will

was contested on the ground of mental capacity. The court said the evidence did not amount to proof, but tended only to excite suspicion, and that it was proper to direct a verdict, as the jury should not have been permitted to guess away the right of the testatrix to dispose of her property as she saw fit, and that the trial court was right in directing a verdict in favor of the will.

*Baker v. Lemon*, 192 Ky. 473, 233 S. W. 1050, tells of a testator who made a will 12 days before he died. He devised his estate of $30,000 to the widow by his second marriage. Two married daughters of his first marriage contested the will. It was held that the unsupported expression of opinion by one of the daughters that her father was of unsound mind, and the fact that he disposed of two life insurance policies as if they were payable to his estate when they were payable to beneficiaries, was held to be insufficient to grant a submission to the jury upon the question of mental capacity.

Let us examine the case of *Frohman v. Lowenstein*, 303 Mo. 339, 260 S. W. 460, which involved the question of mental capacity. A verdict was returned in favor of the contestant. Testator lost $75,000 during the panic and took a dose of laudanum, but his life was saved. He was suffering from bulbar paralysis, which lasted nine years. It drew his mouth and lips so that he looked silly, and yet he was not insane. It was held that the evidence was insufficient to submit the question of mental incapacity to the jury, and the trial court erred in refusing a peremptory instruction in favor of the will.

In *Seamans v. Gallup*, 195 Ia. 540, 190 N. W. 395, the jury returned a verdict finding the testator incompetent. It was reversed on appeal. It was stated that the question is not whether some evidence of mental incapacity has been introduced, but it must appear that testator's mental weakness was so complete that he ceased to comprehend the nature and effect of the act of testamentary disposition. It is stated that the court should have sustained the defendant's motion for a directed verdict, as the verdict of the jury was not sustained by sufficient evidence.

Many other cases have been examined in which the court approves taking the question of competency from the jury: *In re Walz's Estate,* 215 Mich. 118, 183 N. W. 754; *Woodman v. Morgan,* 200 Ia. 500, 203 N. W. 298; *In re Morris' Estate,* 228 Mich. 555, 200 N. W. 135; *Kelley v. Stanton,* 141 Md. 380, 118 Atl. 863; *Estate of Campbell,* 46 Cal. App. 612, 189 Pac. 812; *Spencer v. Spencer,* 221 S. W. (Mo.) 58; 28 R. C. L. 405, sec. 417.

Now let us examine cases which were properly submitted to the jury on this question of incompetency. Where testator was 86 years old, and had suffered two paralytic strokes and was unable to remember or carry on a connected conversation, his competency was held to be a question for the jury. *In re Estate of Ross,* 173 Cal. 178, 159 Pac. 603. Where the testimony is hopelessly in conflict, it should be submitted to the jury (*Baddeley v. Watkins,* 293 Ill. 394, 127 N. E. 725), and where the evidence is of such substance and relative consequence relating to competency as to carry the quality of proof and induce a belief in its efficacy (*Humphrey v. Neal,* 199 Ky. 498, 251 S. W. 637), or where a testator had delusions and hallucinations, was profoundly melancholy, suffering from mania of persecution, imbued with suicidal intent, and his conversations and conduct were strange and abnormal, as in *Whittlesey v. Gerding,* 246 S. W. (Mo.) 308, the question of mental competency would be for the jury, for if the jury rejects a will under such evidence, then the court would have ample grounds upon which to sustain such a finding.

We find one case which covers so many of the features involved in the case at bar that we present it briefly. In *In re Tymeson's Will,* 187 N. Y. Supp. 330, the court says that the test is, was testator's mind capable of understanding the nature and disposition of his property and his relations with his relatives? If he has this upon the date he made the will, he is a person of sound mind and memory within the meaning and intent of the statute of wills. It is said that less mental faculty is required to

execute a will than to enter into any other legal instrument; that the testator's property was his own, he had the power to do with it as he chose, and while he may have had delusions, that does not of itself constitute incapacity, for a delusion affects testamentary capacity only when it enters into and controls its exercise. Gross eccentricity, slovenliness in dress, peculiarities of speech and manner, or ill health are not facts sufficient to disqualify a person from making a will. The fact that the will was executed under the supervision of a lawyer affords a strong presumption that it was executed in compliance with the formal requirements of the statute. A very high degree of mentality is not required to make a valid will in case it is free from undue influence. If in the opinion of the court a verdict against a will would have to be set aside as against the weight of the evidence, the issue of mental capacity should not be submitted to the jury. "To justify the direction of a verdict, it is not necessary that there should be literally no evidence to go to the jury; it being sufficient that there is none that ought reasonably to satisfy the jury that the fact sought to be proved is established." All of these findings are approved in the later case of *In re Whitmarsh's Estate* (1929), 234 N. Y. Supp. 505, in which it is held that it is not medical soundness that governs, but testamentary capacity as defined by law, and that the law does not put any obstacle in the way of the aged or infirm in making disposition of their property by will.

In the light of the law as set out in these decisions, let us consider the case at bar. It is clear that, even though there is a small amount of evidence to support the contestant's claim of incapacity, that is not alone sufficient to require the court to submit that issue to the jury, for there is a clear, decided, and overwhelming preponderance of evidence showing that the testator was of sound mind and disposing memory at the time he executed the will. He knew the amount and character of his property; he knew his other relatives, but had decided he wanted his

brother Jim to have his farm. He told several people of his desire, and the court is convinced that this was an intelligent disposition of his property. *In re Estate of Laflin,* 108 Neb. 298, 187 N. W. 885; *Carter v. Gahagan,* 102 Neb. 404, 167 N. W. 412; *Bishop v. Scharf,* 214 Ia. 644, 241 N. W. 3.

When the trial judge reached the same conclusion that this court has, it was his duty to withdraw that issue from the jury, which he did. *In re Estate of Bayer,* 119 Neb. 191, 227 N. W. 928; *In re Estate of Slattery,* 125 Neb. 194, 249 N. W. 597. We have examined all of the errors set out by the contestants, and while section 20-853, Comp. St. 1929, allows the court to disregard those errors which are not prejudicial, yet we cannot discuss others because of the length of this opinion, and can only state that we find no prejudicial errors in the record.

The judgment of the trial court, finding that the judgment of the county court in admitting said will to probate was right, is sustained by the record in this case, and said judgment is hereby

AFFIRMED.